150 N.J. Super. 277 (1977)
375 A.2d 675
WM. BLANCHARD CO., PLAINTIFF-APPELLANT,
v.
BEACH CONCRETE CO., INC., DEFENDANT AND THIRD-PARTY PLAINTIFF-RESPONDENT,
v.
WASHINGTON PARK BUILDING, INC., THIRD-PARTY DEFENDANT-RESPONDENT, C.S.T. ERECTION CO., EAST ET AL., PLAINTIFFS-RESPONDENTS,
v.
WASHINGTON PARK BUILDING, INC. ET AL., DEFENDANTS-RESPONDENTS,
v.
WM. BLANCHARD CO., THIRD-PARTY PLAINTIFF-APPELLANT,
v.
BEACH CONCRETE CO., INC., ET AL., THIRD-PARTY DEFENDANTS-RESPONDENTS, WASHINGTON PARK BUILDING, INC., ET AL., THIRD-PARTY PLAINTIFFS-RESPONDENTS,
v.
BEACH CONCRETE CO., INC., THIRD-PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 17, 1977.
Decided May 2, 1977.
*281 Before Judges FRITZ, ARD and PRESSLER.
Mr. John C. Heavey argued the cause for plaintiff-appellant (Messrs. Carpenter, Bennett & Morrissey, attorneys; Mr. William A. Carpenter, Jr. and Mr. Heavey on the brief).
Mr. Robert A. Baron argued the cause for third-party plaintiff-respondent (Mr. Jerome Beaudrias of the New York Bar, of counsel and on the brief).
Mr. Richard L. Plotkin argued the cause for defendant-appellants Washington Park Building, Inc. and Hospital Service *282 Plan of New Jersey, (Messrs. Pitney, Hardin & Kipp, attorneys; Mr. Clyde A. Szuch of counsel and Mr. Plotkin on the brief).
Mr. Richard L. Amster argued the cause for Eastern Schokbeton (Messrs. Amster & Levin, attorneys).
Mr. Hugh P. Francis and Mr. William Tucker argued the cause for respondent C.S.T. Erection Co., East (Messrs. Apruzzese & McDermott, attorneys; Messrs. Stryker, Tams & Dill, attorneys; Mr. Charles H. Friedrich and Mr. David L. Menzel on the joint brief).
Mr. W. Hunt Dumont argued the cause for respondent Welton Becket Associates (Messrs. Robinson, Wayne & Greenberg, attorneys).
The opinion of the court was delivered by PRESSLER, J.A.D.
The appeal before us raises important procedural questions implicating the scope of the entire controversy doctrine, the definition of the mandatory counterclaim rule, the extent to which pleadings may be belatedly amended, and the impact of agreements to arbitrate on these predicates of the judicial process.
This multi-party, multi-issue commercial litigation had its genesis in the construction of a 20-story Blue Cross-Blue Shield office building on Washington Street in Newark. It involves a complex series of affirmative claims expressed by way of complaints, third-party complaints, counterclaims and cross-claims, and amendments to these pleadings by, between among and against seven primary parties. The principal dramatis personae include the owner, Washington Park Building, Inc., a wholly owned subsidiary of Blue Cross[1] (Washington Park); the general contractor, Wm. Blanchard Co. *283 (Blanchard); two of Blanchard's subcontractors, Beach Concrete Co., Inc. (Beach) and Eastern Schokbeton (Schokbeton); Schokbeton's subcontractor C.S.T. Erection Co., East (C.S.T.); and the architect, Welton Becket Associates (Becket).
The instant consolidated appeal by Washington Park and Blanchard challenges two orders of the Chancery Division entered on February 9, 1976 dismissing with prejudice their most recent pleadings by which each belatedly alleged additional and financially substantial claims against the other arising out of the project. These claims had substantial legal and practical effect on the multitude of claims already pending. Each of these two parties, moreover, indisputably had known of the existence of its respective claims against the other for several years prior to their being raised, and each also intended, by assertion of indemnification and contribution rights, to pass on to the other parties to the action the ultimate financial responsibility for the claims made against it by the other. The effect of the orders appealed from was to finally foreclose each of these litigants not only from raising these claims in this litigation but in any subsequent litigation as well. We regard the action of the trial judge to have been eminently correct and we affirm.
It is now almost seven years since this litigation was commenced, and although it has grown in complexity, it is today no nearer trial than it was on the day the first complaint was filed. The complex procedural history of this action and its failure throughout the tortuous course of that history to have reached an adjudication of a single issue on the merits might well serve as a primer demonstrating the endlessly protracted, inordinately wasteful and continuously fragmented judicial process which the explicit procedural reforms of the Judicial Article of the 1947 State Constitution were specifically designed to prevent.[2] Sisyphus, *284 condemned to eternally pushing his rock up the side of the mountain without ever reaching the top, may have been an appropriate metaphorical analogy to the civil justice system of earlier times when multiplicity of actions prevailed and form routinely triumphed over substance. The currency of that analogy here signifies the continued frustration of the goal of affording expeditious substantial justice to litigants on the merits of their controversy and requires reconsideration and restatement of basic principles governing the management of inherently complex litigation. That effort requires us first to chart with specificity the convoluted route by which the present status of this action was reached.
Washington Park, in June 1969, retained Becket as the architect for its Newark Blue Cross building project. Their written contract contained no arbitration clause with respect to disputes which might arise between them. Washington Park also then contracted with its general contractor Blanchard by written agreement which contained a typical "all disputes" arbitration clause applicable to any controversies between them which might arise out of the project. Blanchard subcontracted the construction of the concrete superstructure to Beach and the manufacture and installation of the concrete panels to cover the superstructure to Schokbeton. Each of these contracts contained an arbitration clause covering potential disputes between Blanchard and each of the subcontractors. Schokbeton in turn subcontracted part of its work, the actual installation of the facade panels, to C.S.T. by contract containing, as between them, an arbitration clause. Thus, with respect to potential disputes, Becket had no agreement to arbitrate with anyone. Washington had an agreement to arbitrate only with Blanchard. Blanchard, by way of three separate agreements, was obliged to arbitrate with Washington, Beach and Schokbeton, each of whom was obliged to arbitrate with Blanchard but not with each other or anyone *285 else, except that Schokbeton was obliged to arbitrate with C.S.T., who in turn was obliged to arbitrate with no one else.
Construction of the building commenced, as scheduled, in the summer of 1969. The original undertaking by Blanchard was to complete the project by January 1971, a deadline extended by Washington Park for a period of one month. The building was completed some ten months thereafter. Thus, by early 1972 all claims by all parties related to the project had already arisen and were known to the parties. A primary cause for the delay in completion was a construction problem which constitutes the core of the controversy here. Relatively early in the construction C.S.T. experienced difficulty in installing the concrete facade panels over the concrete columns erected by Beach. That difficulty was attributable either to their improper manufacture by Schokbeton, Beach's failure to have followed Becket's specifications in erecting the superstructure, or Becket's error in formulating the specifications. As a consequence of making the adjustments necessary to correct that difficulty all of the subcontractors allegedly sustained loss because of their required use of extra labor and materials and because of the delays they thereby incurred in completing their respective portions of the work. Blanchard allegedly also suffered loss from the delay in completing the entire project, as allegedly did Washington Park, the ultimate occupant.
Two separate actions were instituted involving the problems resulting from the concrete work difficulties. The first was an action brought by Blanchard against Beach in the Chancery Division, Essex County (Essex Chancery action) in October 1970. The sole subject of the initial complaint was a stop notice filed by Beach pursuant to the Mechanics Lien Act and certifying that it had not been paid the sums then due it from Blanchard. The sole relief sought by Blanchard was discharge of the stop notice. Beach then filed a counterclaim against Blanchard and a third-party complaint against Washington Park alleging a right *286 to damages from each for the losses it had sustained as a result of the concrete-work problem and seeking an order compelling both to arbitrate with it. The stop notice was, in fact, discharged early in the action, leaving only Beach's affirmative claims remaining.
In September 1972, and at least nine months after completion of the project, Schokbeton and C.S.T. instituted the second action in the Law Division, Union County (Union Law suit) by way of suit against Blanchard, Washington Park and Becket in which they sought damages allegedly resulting from the concrete-work problem. In that action both Blanchard and Washington filed third-party complaints against Beach and cross-claims against Becket and each other. Becket, among other procedural steps taken by it, also filed third-party complaints against its consulting engineers. Before, however, instituting the Union Law action, counsel for C.S.T. and Schokbeton had engaged in lengthy negotiations with the parties to the Essex Chancery action, not only as to the merits of all of their respective claims but also as to the manner in which they might be most expeditiously disposed of. The subcontractors and Blanchard were, more specifically, attempting to persuade all parties to agree to either a single consolidated arbitration or a single consolidated litigation which would include all claims, including Washington Park's delay claims which had already accrued, which Washington Park had repeatedly referred to but which it had thus far declined to assert. The commencement of the Union law action signalled the failure of the parties to reach a mutually satisfactory procedural agreement.
That failure was attributable to a variety of strategic decisions of both Washington Park and Blanchard. Chief among these was their expressed determination not to assert their direct claims against each other in the pending litigation  that is, Washington Park's delay claims against Blanchard, which Blanchard would inevitably attempt to pass on to the subcontractors and the architect, and Blanchard's *287 direct claims against Washington Park arising both from the concrete work delays and from other collateral problems, which claims Washington Park would likewise inevitably attempt to pass on. This determination to reserve their direct claims inter se has repeatedly been explained by Washington Park as the legitimate tactic of allowing it and Blanchard to present a "united front" against the affirmative claims against them made by the others. The other main reason for the failure of the parties to have reached procedural agreement was Washington Park's insistence on the one hand that it would not forego its contractual right to arbitrate with Blanchard and on the other that it would not arbitrate with any other party since it had no arbitration agreement with any other party.
Faced with this impasse Beach moved in its Essex Chancery action for an order requiring Blanchard to submit to arbitration with it and staying that action until completion of the arbitration. Blanchard cross-moved for consolidation into a single arbitration of all of the affirmative claims made by all parties to the Essex Chancery action. It also moved to include in that arbitration the claims of C.S.T. and Schokbeton, whom it proposed to join as parties defendant to the Essex Chancery action by way of a new third-party complaint. These motions were decided by the Chancery Division judge in a reported opinion, Wm. C. Blanchard Co. v. Beach Concrete Co., 121 N.J. Super. 418 (Ch. Div. 1972). The primary issue thereby presented, as posed by the judge, was whether, in dealing with the "web of claims" already then raised, he had an alternative under the Arbitration Act to the granting of Beach's motion. He reluctantly determined, however, that he was without power to order either a single consolidated arbitration or a single consolidated litigation of all the claims raised in either or both actions, the Union Law action having already been commenced but not yet consolidated. 121 N.J. Super. at 423. Noting that "It cannot be right to cut up this litigation into two actions, one to be tried before the *288 arbitrator and the other to be tried elsewhere", the judge nevertheless concluded that there was "no proper way to reach that result, especially for a trial court in the absence of authority and in the face of our statute [N.J.S.A. 2A:24-1 et seq., 2A:24-4]" Id. at 428.
Resolution of the issues here raised constrains us to comment hereafter on the Chancery Division judge's reasoning. We note now, however, that its consequence was readily apparent to all of the litigants in both actions, namely, that before further judicial proceedings could ensue, every party having a contractual right to arbitration could insist on a separate arbitration, and no party, moreover, could be compelled to litigate an arbitrable claim or to arbitrate a litigable claim. The potential inherent in that result for expense, delay, inconsistent results and indeed, ultimate and utter chaos, is truly mind-boggling. The practical effect of the decision, because of the interrelatedness and interdependency of all of the claims, was to deny all parties further access to the courts for resolution of any aspect of the controversy until possibly four separate arbitrations had been completed, that is, Washington Park-Blanchard, Blanchard-Beach, Blanchard-C.S.T. and C.S.T.-Schokbeton. The parties' own appreciation of the morass ahead inspired a variety of responses. Blanchard appealed from the order granting Beach's motion and moved in the Chancery action for rehearing, for a stay pending appeal, for an order consolidating the Union Law action, and for an order staying, pending arbitration, the claims against it therein made by C.S.T. and Schokbeton. Those motions were heard by a second Chancery judge, the first in the meantime having retired.
While awaiting his disposition, all parties in both actions renewed their procedural negotiations, and finally, in February 1973, reached an accord, memorialized in an order entered by the Essex County assignment judge, consented to by all litigants in both actions. The essence of the order was the waiver by all parties of their respective *289 arbitration rights and the consolidation of the Union Law action with the Essex Chancery action. That order, a critical document here, stated among its recitals the following:
* * * and it appearing that the above-entitled actions involve common questions of law and fact and arise out of the same transaction and series of transactions and that all parties are willing to waive such rights as they may have to arbitrate the disputes or claims which are involved in the above-entitled actions * * *.
It provided, accordingly, that
* * * said actions as so consolidated shall be tried before the Superior Court of New Jersey, Chancery Division, Essex County, in lieu of arbitration, the Court expressly approving by the Order the waiver of all parties of any rights they may have to arbitration of the claims and disputes asserted in the above-entitled actions.
Thereafter, and through the spring of 1975 ensued what the parties refer to as "massive" discovery and motion efforts. Pretrial conference was finally scheduled for May 2, 1975, and in anticipation thereof each party was directed by the now third Chancery judge, Judge Kimmelman (the second judge having been in the interim assigned to this court), to meet separately with every party against whom it had asserted an affirmative claim, for the purpose of exploring settlement possibilities. Beach accordingly met with, among others, Washington Park, who advised it that no offer of settlement could be made because it, Washington Park, still intended, after the conclusion of the litigation, to raise its yet still unasserted delay claims  claims which the subcontractors and the architect had assumed had been abandoned because not thus far raised in the consolidated litigation and whose continued viability obviously would preclude any settlement of any of the pending claims. Beach, thus despairing of settlement and recognizing that the disposition of the pending litigation would otherwise be anything but conclusive, then moved for an order requiring Washington Park to raise its delay claims *290 in the action or be forever barred therefrom. That motion was returnable at the pretrial conference, which was consequently aborted by the granting of the relief Beach sought.
Accordingly, on May 8, 1975 Washington Park at long last asserted its delay claim against all parties by filing a counterclaim against C.S.T. and Schokbeton, an amended third-party complaint against Beach and an amended cross-claim against Becket and Blanchard. Blanchard's response was then, on May 28, 1975, to raise its direct claims against Washington Park, including its own delay claims, by filing an amended cross-claim against Washington Park and Becket, to which Washington Park responded two days later by amending its amended cross-claim against Becket seeking contribution or indemnification with respect to Blanchard's claim against it. As a final fillip, Washington Park, in August 1975, sought leave to assert against Blanchard a variety of "punchlist" and warranty claims, some involving the concrete work and some not. That application was denied. Washington Park accordingly commenced a new action against Blanchard in the Essex County Law Division in early November 1975, asserting these claims.
Following Washington Park's unsuccessful attempt to raise its punchlist and warranty claims against Blanchard in the pending litigation, Schokbeton, C.S.T. and Becket, convinced of the disastrous effect upon them of the Washington Park May 8 delay claims, moved for dismissal thereof with prejudice on the ground of waiver, estoppel, failure of compliance with mandatory joinder requirements and violation of the entire controversy doctrine. That relief was granted. Washington Park then moved for dismissal of Blanchard's May 28 direct claims against it. Blanchard responded with a motion for an order restraining Washington Park from proceeding with its new Law Division punchlist and warranty action against it. The entire fall of 1975 was consumed by the making of these various applications and the arguments and rearguments thereon. At the final hearing on all of them on January 22, 1976, Judge *291 Kimmelman ultimately concluded that the entire controversy doctrine required that all of the pleadings filed by all the parties following the scheduled May 2, 1975 pretrial conference should be dismissed with prejudice, with the action thus reverting to its May 2, 1975 status. That determination was set forth in the companion orders of February 9, 1976 here appealed from.[3]
The essential theory here relied on both by Washington Park and by Blanchard in seeking to preserve the complex of dismissed claims derives from the Chancery Division's reported Blanchard opinion, supra, which preceded and, in fact, precipitated the February 1973 waiver and consolidation consent order. Their argument is simply that as a result of that decision they were each precluded from attempting to litigate claims against each other which were covered by their arbitration agreement, and further, that their waiver of arbitration set forth in the February 1973 consent order applied only to the precise claims then asserted in the two pending actions and not to any other claims, whether or not assertable therein. It was not only their right to withhold these claims, they thus argue, but they moreover had no choice but to withhold them for future arbitration between themselves even though the outcome of that arbitration might affect the other parties to the litigation and the issues therein litigated. Counsel for Washington Park frankly concedes that the not improbable consequence of the position he takes here may well be, after the conclusion of the originally postured consolidated litigation, the commencement of another quarter-century of arbitration, followed by litigation, followed by arbitration, in virtually infinite sequence.
*292 We are completely satisfied that the contentions raised on this appeal by Washington Park and Blanchard are as disingenuous as they are inimical to the very foundations of our civil justice system. It is not necessary for us to evaluate the full impact of the arbitration agreement on the otherwise applicable procedural dictates governing this controversy because, for the reasons hereafter stated, we are persuaded that the effect of the waiver of the right to arbitrate contained in the February 1973 consent order was the submission of this controversy to the court subject to those dictates. We, therefore, address ourselves initially to the question of what the obligations of the appellants would have been to raise the dismissed claims timely in this action had there been no agreement to arbitrate. We are persuaded, first, that in the absence of that arbitration agreement, the failure to have raised these claims in this litigation would have barred their being raised in any subsequent litigation. That result would have been mandated both by the entire controversy doctrine and by the mandatory counterclaim rule. R. 4:7-1.
The entire controversy doctrine has never been more clearly defined as a matter of concept than it was by Justice Brennan in Ajamian v. Schlanger, 14 N.J. 483 (1954), cert. den. 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954). The basic intention of the Judicial Article of the 1947 State Constitution and the implementing court rules, as he understood them, and as they have been undeviatingly understood since, was to provide
* * * for the just and expeditious determination in a single action of the ultimate merits of an entire controversy between litigants. It is a fundamental objective of this procedural reform to avoid the delays and wasteful expense of the multiplicity of litigation which results from the splitting of a controversy. [at 485]
Accordingly, and consistent with the demands of a modern and responsive civil justice system, the application of the doctrine requires that a party who has elected to hold back from the first proceeding a related component of the controversy *293 be barred from thereafter raising it in a subsequent proceeding. It is only that bar which can effectively prevent the evil of "* * * piecemeal litigation of fragments of a single controversy." Falcone v. Middlesex County Med. Soc., 47 N.J. 92, 94 (1966); Applestein v. United Board & Carton Corp., 35 N.J. 343, 356 (1961); Korff v. G and G Corp., 21 N.J. 558, 567 (1956); Vacca v. Stika, 21 N.J. 471, 475-476 (1956); Leisure Technology v. Klingbeil, 137 N.J. Super. 353, 357 (App. Div. 1975); Thatcher v. Jerry O'Mahoney, Inc., 39 N.J. Super. 330, 335-336 (App. Div. 1956); Silverstein v. Abco Vending Service, 37 N.J. Super. 439, 449 (App. Div. 1955). And see, State v. Gregory, 66 N.J. 510, 518 (1975).
The implications of Ajamian were promptly perceived by Professor Schnitzer, who analyzed the impact of the Brennan formulation thus:
It is quite clear, however, that the new unit of litigation is the "entire controversy" rather than its constituent causes of action, and that within the area of this new unit, the joinder of claims is compulsory under penalty of forfeiture. [Schnitzer, "Civil Practice and Procedure," 9 Rutgers L. Rev. 307, 334 (1954)]
While the compulsion of the entire controversy doctrine requires a significantly broader scope of compulsory claim joinder than is prescribed by the limited mandatory counterclaim rule, R. 4:7-1, it is also apparent that the task of definitionally circumscribing the outer limits of a given controversy for purposes of application of the doctrine is inordinately difficult. Cf. Silverstein v. Abco Vending Service, supra, 37 N.J. Super. at 449. As a practical matter, the doctrine cannot be dealt with on an a priori basis. It must be applied empirically. That is to say, an evaluation must be made of each potential component of a particular controversy to determine the likely consequences of the omission of that component from the action and its reservation for litigation another day. If those consequences are likely to mean that the litigants in the action as framed will, after *294 final judgment therein is entered, be likely to have to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or related series of transactions, then the omitted component must be regarded as constituting an element of the minimum mandatory unit of litigation. That result must obtain whether or not that component constitutes either an independent cause of action by technical common-law definition or an independent claim which, in the abstract, is separately adjudicable.
The point, of course, is that a component of the controversy may not be unfairly withheld, see State v. Gregory, supra, 66 N.J. at 518, and a withholding is by definition unfair if its effect is to render the pending litigation merely one inning of the whole ball game. As former Chief Justice Vanderbilt trenchantly expressed the concept, the fundamental object of the entire controversy doctrine is to prevent any single action from being nothing more than "the trigger which * * * would start the chain reaction of other litigation to resolve the balance of the issues raised by the entire controversy." Vacca v. Stika, supra, 21 N.J. at 476.
So tested, the dismissed claims are, inescapably, part of the entire controversy here. This litigation concerns a single transaction  a transaction whose narrowest scope includes the respective performance by each of the present litigants of their respective contractual undertakings vis-a-vis this building project and whose rights and liabilities inter sese are finally determinable without joinder of additional parties. The purpose of the litigation, from the point of view of the subcontractors and the architect, was to obtain a definitive adjudication of their respective rights and liabilities resulting from their participation in the project. That objective would be patently frustrated if this litigation were, as appellants would have it, limited only to an adjudication of the rights and liabilities initially asserted, leaving the other parties vulnerable, by way of subsequent action, to additional ultimate responsibility, based on the same performance, for the *295 direct claims between the owner and the general contractor. The architect would be in an even more hapless position, the limit of his exposure to respond in damages for the same alleged error determinable only after multiple litigation. That neither the full scope of any of the affirmative claims originally raised in the litigation nor the ultimate limitations of obligation of any party to respond in damages therefor could possibly be finally determined in this litigation is further evidenced by the practical impossibility of settlement of even a single constituent claim or issue. It is not unlikely that if all claims of all parties, including those of appellants, had been openly exposed at the outset, permitting each of the parties to make a rational and complete appraisal of its position, the real entire controversy here, or at least a substantial portion of it, would long since have been settled.
In this posture Washington Park's assertion of the right to withhold its claims, purportedly against Blanchard but actually against the others, constitutes an unacceptable imposition upon the other parties, the court, and the entire justice system. As inextricably bound as those claims are to the matters which were already placed in controversy and as essential as their assertion was to any final adjudication of that controversy, Washington Park nevertheless has insisted throughout and continues to insist that it was under no compulsion to raise them. As its counsel simply stated on the record when Beach first realized, in 1975, that Washington Park intended to preserve these claims beyond the conclusion of the litigation, "We do not want to assert those claims at this time." The time, however, has long since passed when a litigant has that option.
We are satisfied that the withheld claims are subject not only to the entire controversy doctrine but to the mandatory counterclaim rule as well. R. 4:7-1 provides that:
* * * A defendant, however, failing to set off a liquidated debt or demand, or a debt or demand capable of being ascertained by calculation, shall thereafter be precluded from bringing any action for such debt or demand which might have been so set off. *296 Thus it is narrower in scope than the entire controversy doctrine in that it imposes a joinder obligation only upon a party against whom an affirmative claim has been made, and the extent of that obligation is only to set off, as against the party making the affirmative claim, liquidated demands or demands ascertainable by calculation, whether or not germane. All three sets of claims whose dismissal is here appealed from are, without question, liquidated or liquidatable. Appellants urge that they were not required by the rule to raise them against each other because their relationship to each other in this litigation was not that of opposing parties and because they had made no affirmative claim against each other.
This contention is untenable both as a matter of fact and of law. The initial flaw in appellants' thesis proceeds from their too narrow understanding of the meaning of an affirmative claim. For purposes of the rule at least, an affirmative claim must be understood to mean any claim which may be independently asserted in a complaint and which, if proved, will entitle the plaintiff to a money judgment. An asserted right to contribution as well as an asserted right to indemnification will obviously support a separate and independent complaint demanding monetary relief, and hence both are affirmative claims requiring a set-off by way of mandatory counterclaim. See, e.g., Markey v. Skog, 129 N.J. Super. 192 (Law Div. 1974).
We are, moreover, satisfied that the term "defendant" used by the rule to identify a party required to set off is not intended to describe merely one's technical denomination in the action but rather refers to his actual status in terms of a potential liability to respond in damages. Thus, the term "defendant" includes any party against whom an affirmative claim is made. If that party has a liquidated or liquidatable claim against the party making the affirmative claim against him, he is required to set it off. It is of no moment that their original denomination in the action is that of codefendants or coplaintiffs or any other combination *297 short of a denominated plaintiff and defendant relationship. Modern litigation is too complex for the simplistic reading here urged. In any event, these theories of Washington Park and Blanchard can hardly apply to the subcontractors and architect with whom their relationship in this litigation was always the traditional one of plaintiff and defendant and against whom their purported direct claims against each other were also asserted. In short, the purpose and policy of the mandatory counterclaim requirement of R. 4:7-1 is identical to that of the more broadly conceived entire controversy doctrine. See Schweizer v. MacPhee, 130 N.J. Super. 123 (App. Div. 1975). With respect, therefore, to those claims within its more limited area of applicability, R. 4:7-1 must be construed consistently with the precepts of the entire controversy doctrine.
Based on all of the foregoing, we have not the slightest doubt that the three sets of withheld claims were in ordinary circumstances withholdable from this litigation only on penalty of forfeiture. The next question, then, is whether the Washington Park-Blanchard arbitration agreement constitutes an extraordinary circumstance relieving these parties from that consequence. That inquiry requires us first to construe the consent order of February 1973 in which the parties waived, at least to some extent, their arbitration rights. That order provided, as we have noted, for such a waiver in respect of "the claims and disputes asserted in the * * * actions." Appellants contend that "asserted" means only those claims which had already been actually asserted and is not by construction extendable to include assertable but not yet asserted claims. They further argue that since they could not be involuntarily deprived of their right to arbitrate with each other, they were free to limit their waiver of arbitration in any way they saw fit. All of the other parties argue precisely the opposite, relying not only on what they urge was actually intended and what they then understood "asserted" to include, but pointing out further that as of February 1973, the withheld claims had all already accrued *298 and all of the parties knew of their existence. Whether or not the disputed word "asserted" in the order is construable as including all permissibly assertable claims is not a determination which we must make. We are persuaded that it must be construed as at least including all mandatorily assertable claims. Once appellants voluntarily chose to submit to the judicial process, they must, as a categorical imperative, be deemed to have elected to submit in accordance with the rules of court and to an extent which would afford the other litigants at least the same fundamental fair play to which they would have been entitled had the submission not been voluntary. One of the inevitable consequences of appellants' submission was, therefore, that the scope of the submitted controversy would have to be ultimately determined by rules and principles applicable to any other action, and those rules and principles include the dictates of R. 4:7-1 as well as those of the entire controversy doctrine. To attempt, by a more limited submission to the judicial process, to undermine the ability of that process to function adequately and to prevent it from protecting both itself and other parties from unwarranted imposition and interference, is not an exercise which can be tolerated. Permissive joinder of assertable claims may well not have been included within the terms of the waiver. Mandatory joinder, however, was. Appellants must be bound by what the necessary implications of their election were.
In light of these principles, we now consider the actions taken by Judge Kimmelman. The dismissal of the withheld claims could technically not have been based either on the entire controversy doctrine or on the mandatory counterclaim rule. Those are principles which, because they bar subsequent litigation of particular omitted claims, do not ordinarily come directly into play at all until after the completion of the first proceeding and at such time as they are actually attempted to be raised in a later proceeding. Here, the claims were attempted to be raised in the initial proceeding. What Judge Kimmelman, therefore, was actually *299 dealing with, as a matter of substance, were motions to amend pleadings pursuant to R. 4:9-1. He himself construed his original direction to Washington Park to raise its delay claims, a direction which triggered the assertion of the remaining withheld claims, as, in effect, a device to enable him to assess precisely what the impact of those claims upon this already five-year old litigation would be. That was an entirely reasonable approach, the purpose of which is expressly served by the requirement of the rule that a copy of the amended pleading be annexed to the motion to amend. After he had compelled the withheld claims to be stated with particularity, he then concluded that their complicating scope and nature would delay for years longer the trial which would already have been completed[4] had those claims not been raised.
While motions to amend pleadings are required by the express terms of the rule to be liberally granted, there remains nevertheless a necessary area of judicial discretion in denying such motions where the interests of justice require. We are mindful of this history of this monumentally vexatious litigation both as the trial judge inherited it and as it progressed before him. His conclusion that these claims had been too long withheld and would, therefore, have an inordinately prejudicial effect on the other parties in terms of delay, expense and their basic ability to then prepare to meet these claims cannot be faulted. The entire controversy doctrine and the mandatory joinder rule became relevant at that juncture of the case because it was entirely appropriate, if not indeed mandated, that the trial judge, in determining whether to allow the claims to be made belatedly, should consider the preclusionary consequences of his denial of that leave. He correctly concluded that if the claims were not permitted to be raised in this litigation, they would be thereafter barred. Although *300 that is a conclusion ordinarily militating toward the grant of amendatory relief, the trial judge did not abuse his discretion in denying it under these extraordinary circumstances.
Since our affirmance is based essentially on our conviction that the scope of the agreement to waive arbitration has to be construed in terms of the principles of mandatory joinder of claims, we do not reach the very troublesome questions raised by the Chancery Division's reported Blanchard opinion and, more particularly, the extent to which the statutorily assured arbitration right was therein permitted to undermine, if not indeed to defeat, the very basis upon which our judicial system is constructed. The result in Blanchard was, in our view, in direct contradiction to the principle of expeditious determination of an entire controversy, a principle to which we are irrevocably committed as the first premise for proper administration of civil justice. We suggest that the Chancery Division judge took too narrow a view of his authority under the Arbitration Act, and we are impressed with the contrary conclusion recently expressed by the Chancery Division in Polshek v. Bergen Cty. Iron Works, 142 N.J. Super. 516 (Ch. Div. 1976), in which, in similar circumstances, consolidated arbitration was ordered even though not every party thereto had an arbitration agreement with every other party.
While we regard the alternative of consolidated arbitration as alleviating, and possibly to a substantial degree, many of the disastrous procedural consequences of the Chancery Division's approach in Blanchard, we nevertheless recognize that it is not the whole answer. In complex multi-party, multi-issue litigation the problem lies in a virtually inherent confrontation between inconsistent and contradictory rights  the primary right of some of the litigants to arbitrate and the primary right of others to litigate. It can be seriously questioned whether it is possible to accommodate one without defeating the other. The attempt, however, must be made, and the resolution must be one *301 which does not impair the philosophy of the Judicial Article of the State Constitution. We have attempted to do so here by construing a waiver of the right to arbitrate in accordance with the minimum fundamental responsibility of the court to litigants and of litigants to litigants. Here, of course, the waiver was express. It may well be that the same scope of waiver must be implied when any party to an action who has a right of arbitration makes any interrelated or interdependent affirmative claim therein against any other party. It may be, however, that the solution, in view of the terms of the Arbitration Act, must come from the Legislature. We view the problem as one requiring prompt attention and recommend its consideration by appropriate agencies of government.
Affirmed.
NOTES
[1] While Blue Cross is a separately named party, it is for all purposes of the litigation and this appeal the same party as Washington Park, and hence will not herein be separately referred to.
[2] N.J. Const. (1947), Art. VI § III, par. 4. And see, generally, Ajamian v. Schlanger, 14 N.J. 483 (1954), cert. den. 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954); Massari v. Einsiedler, 6 N.J. 303 (1951).
[3] We note that while these orders were clearly interlocutory, they were "certified" as final by Judge Kimmelman pursuant to R. 4:42-2. Without commenting upon the correctness of that procedure, we are satisfied that this appeal must be determined on its merits at this juncture of the litigation and so proceed, treating the notice to appeal as a motion for leave to appeal, which we grant.
[4] When the May 2, 1975 pretrial was scheduled, trial itself was contemplated to commence in June or July of that year.