236 N.J. Super. 349 (1989)
565 A.2d 1113
DU-WEL PRODUCTS, INC., A MICHIGAN CORPORATION, PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
UNITED STATES FIRE INSURANCE COMPANY, A NEW YORK CORPORATION, WESTCHESTER FIRE INSURANCE COMPANY, A NEW YORK CORPORATION, DEFENDANTS-RESPONDENTS/CROSS-APPELLANTS, AND CRUM AND FORSTER, INC., DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued September 19, 1989.
Decided October 26, 1989.
*352 Before Judges PRESSLER, LONG and LANDAU.
Phillip R. Sellinger argued the cause for appellant/cross-respondent (Sills Beck Cummis Zuckerman Radin Tischman & Epstein, attorneys; Kenneth F. Oettle and Philip R. Sellinger, of counsel; Marc S. Berman, on the brief).
Kenneth A. Seltzer argued the cause for respondents/cross-appellants (Vitiello, Seltzer, Terkowitz & Vitiello, attorneys; Kenneth A. Seltzer, of counsel; Kimberly G. Kingsland and Kenneth A. Seltzer, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
*353 Plaintiff Du-Wel Products, Inc., a Michigan corporation, brought this declaratory judgment coverage action against its comprehensive general liability carriers, defendants United States Fire Insurance Company and Westchester Fire Insurance Company. It seeks recovery for a loss in excess of half-a-million dollars it incurred complying with a consent order entered by the United States Environmental Protection Agency (EPA) requiring it to clean up a landfill in Michigan to which toxic sludge generated by its electroplating process had been transported by an independent state licensed hauler between 1968 and 1977.[1] Following trial the judge rendered an oral opinion concluding that coverage was unavailable both under the pollution exclusion clause of the policies and their definition of "occurrence." A conforming judgment was entered dismissing the action, and plaintiff appeals.

I. THE ISSUES
The primary issue before us is whether the trial judge correctly construed the occurrence and pollution exclusion provisions of the policies in the context of the facts before him. By way of preliminary comment, we note that a prior ruling in the action, made by a different judge, determined that the law of Michigan applied to the policy interpretation issues. That ruling was never challenged; Michigan law was applied by the trial judge; and our review is based on Michigan law as well.
We further point out, as a preliminary matter, that because the judge viewed these two clauses as preclusive of plaintiff's claim, he did not address defendants' other major defense to coverage, namely, the contention that the named insured was not plaintiff but its wholly owned subsidiary, Hartford Metal *354 Protection, Inc., whose name was changed some time after its acquisition by plaintiff to Du-Wel Hartford, Inc. (Hartford). The gravamen of this contention is that although the toxic waste was generated by Hartford, the EPA never made a claim against Hartford, the consent order was signed by Du-Wel, and the cleanup costs were paid by Du-Wel. We gather then that the argument is that Du-Wel is in effect an uncovered stranger to the policies. Defendants' brief on appeal makes clear that they have not abandoned this defense, which was fully tried, and hence, if we should reverse on the interpretive issue, they are nevertheless entitled to findings of fact and a decision on the named-insured issue.[2]
There are two additional interlocutory rulings which are before us and which require decision only if we disagree with the trial judge's construction and application of the occurrence and pollution exclusion clauses. The first is the pretrial ruling made by the motion judge, not the trial judge, that even if successful, plaintiff would not be entitled to an award of counsel fees pursuant to R. 4:42-9(a)(6). The basis of this ruling was the judge's perception that since Michigan law applied to the policy interpretation issues, it also governed the insured's right to recover counsel fees incurred as the result of the liability insurer's wrongful refusal to provide the requested defense and indemnity.
The second of these interlocutory rulings is the subject of defendants' cross-appeal. Prior to trial, they moved for leave to file a third-party complaint against American Bankers Insurance Company of Florida. The gravamen of the proposed complaint was that that carrier had also, during the period in question, issued a policy of comprehensive general liability coverage to plaintiff insuring against the same risks and, therefore, owed defendants contribution or indemnification. *355 That motion, opposed by plaintiff, who itself had made no claim against American Bankers, was denied by the motion judge on the grounds both of untimeliness and defendants' failure to demonstrate, at least on the motion, that American Bankers was "a viable third-party defendant" who had issued a comparable policy.
We hold that neither the occurrence nor the pollution exclusion clause preclude coverage, that defendants are entitled to a disposition by the trial court of their named-insured defense, that the motion judge erred in his conclusion that the benefit of R. 4:42-9(a)(6) was not available to plaintiff, and that the denial of defendants' motion for leave to file a third-party complaint did not constitute an abuse of discretion.

II. OCCURRENCE AND POLLUTION EXCLUSION
The policies in question[3] provide for the insurers' undertaking to
pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence....
"Occurrence" is defined as
an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.
The pollution exclusion excepts from coverage
property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water cause or body of water, but this exclusion does *356 not apply if such discharge, dispersal, release or escape is sudden and accidental. [Emphasis added]
The questions before the trial court, therefore, were first whether, as construed by Michigan law, Du-Wel met the "occurrence" provision in that the damage caused by the dumping of its sludge was neither expected nor intended from its standpoint and, second, whether for purposes of the policy, as construed by Michigan law, Du-Wel came within the exception to the pollution exclusion in that the discharge of contaminants was "sudden and accidental."
Before addressing the facts adduced and as found by the trial court, we must make clear that there have been significant events in the development of Michigan law since the judge rendered his oral opinion. The first of these was the decision by the Michigan Court of Appeals in Upjohn Company v. New Hampshire Insurance Company, 178 Mich. App. 706, 444 N.W.2d 813 (1989), which affirmed a written circuit court opinion. The trial judge was aware of the appealed circuit court opinion, appreciated its lack of precedential value, and agreed to wait for a reasonable time for the opinion of the Court of Appeals. It was not forthcoming during the six-month period following the close of the evidence, and the trial judge quite properly decided to wait no longer. As he said at the outset of his oral opinion:

Upjohn was the cornerstone of plaintiff's legal argument respecting the law of Michigan, Upjohn was an unreported opinion. The Court learned that the defendants had filed notices of appeal from the adverse decision of the trial judge. The matter has been pending before the appeal court in Michigan but has not yet been resolved.
While the result of the Upjohn case no doubt would have been important to this Court's determination, the Court has reached the point where it simply cannot wait any longer.
The second significant event was the decision by the United States District Court in U.S. Fidelity and Guar. Co. v. Thomas Solvent Co., 683 F. Supp. 1139 (W.D.Mich. 1988), decided shortly before the trial court's opinion and not brought to its attention. While it is unfortunate that the trial judge did not have the benefit of these authorities, it is clear that they now constitute *357 a critical component of the law which we must consider in reviewing this matter.
We address first Upjohn, supra. As we read that opinion, which deals with precisely the same two clauses in issue here, it declares that as a matter of Michigan insurance law, the occurrence definition requires the extension of coverage for long-term polluting activity of the insured provided that the resultant damage for which coverage is sought was neither intended nor anticipated by the insured. It further declares, as a matter of Michigan law, that applicability of the exception to the pollution clause is not precluded by a long-term or continuous exposure. All that is required to qualify for the exception to the exclusion is that the continuous discharge of the pollutants be unintended (i.e., accidental) and unexpected (i.e., sudden). U.S. Fidelity & Guar. Co., supra, similarly holds in the context of the duty to defend. In short, then, we understand Michigan law to hold that damage to the property of others caused by intentional polluters is not indemnifiable under both the occurrence definition and the pollution exclusion but that damage caused by accidental or even ordinarily negligent polluters who neither intend nor expect the ensuing damage is indemnifiable despite long-term and repeated polluting activity. See also Jonesville Prod. v. Transamerica Ins. Group, 156 Mich. App. 508, 402 N.W.2d 46 (1986), app. den. 428 Mich. 897 (1987). Michigan law is, consequently, not materially different from New Jersey's. See, e.g., CPS Chemical Co. v. Continental Ins., 222 N.J. Super. 175 (App.Div. 1988); Broadwell Realty v. Fidelity & Cas., 218 N.J. Super. 516 (App.Div. 1987); CPS Chem. Co., Inc. v. Continental Ins. Co., 199 N.J. Super. 558 (Law Div. 1984), rev'd and remanded on other grounds 203 N.J. Super. 15 (App.Div. 1985); Jackson Tp. Etc. v. Hartford Acc. & Indemn. Co., 186 N.J. Super. 156 (Law Div. 1982); Lansco, Inc. v. Dept. of Environmental Protection, 138 N.J. Super. 275 (Ch.Div. 1975), aff'd o.b. 145 N.J. Super. 433 (App.Div. *358 1976), certif. den. 73 N.J. 57 (1977).[4]
It is in the light of the foregoing holdings that we consider the salient facts. To begin with, the trial judge clearly and accurately summarized the industrial process which produced the toxic sludge. In brief, the process of placing a chromium layer on a zinc die cast product requires coating the zinc with an initial layer of copper, then with a layer of nickel, and finally with a layer of chromium. These steps generate toxic residuals which are chemically treated in order to render them inert and benign. The treated residuals consist both of a liquid effluent and the precipitated-out solids, which constitute the sludge. During the entire period in question, 1968-1977, the State of Michigan by its Department of Natural Resources (DNR) permitted the discharge of the treated effluent into the public waterways, exercising a regular and strict monitoring control over its chemical composition. Insofar as the record indicates, plaintiff meticulously complied with all DNR rules, regulations, standards, and reporting requirements, and no claim has ever been made against it for any contamination of streams, rivers or any other water supply resulting from the effluent discharge.
The problem concerns the sludge. During the time in question, neither DNR nor EPA prescribed any treatment standards for the sludge beyond those applicable to the treatment of effluent. As explained on cross-examination by plaintiff's electroplating supervisor:
Q. Now, you earlier testified I think in response to a question by Mr. Oettle, that the composition of the sludge would have been essentially the same that was in the effluent  I'm trying to remember your testimony, in terms of what it contained by way of chemicals or metals.
A. No, not really.
Q. Okay, I had just made the following note, and correct me if I'm wrong, did you testify that what was in the effluent would be in this sludge?

*359 MR. OETTLE: Your Honor, I believe he testified 
A. What would remain after the treatment would be the same in the effluent as well as the sludge.
Q. Okay, now once again would you just define effluent for me, please, what is effluent?
A. Effluent is the water that would be  well, you might say on the top of the sludge, the 98 percent portion of the treated waste.
Q. Okay, and part of the treating waste would be the solid residue, is that correct?
A. Yes, yes.
Q. Now, that residue you say contained cyanide, that sludge contained cyanide?
A. It contained treated cyanide.
Q. Okay, now how was the cyanide itself treated?
In other words, just to go back, I don't want to go through the whole process, but after the manufacturing or the plating process is completed, we end up with some cyanide, is that correct?
A. Yes.
Q. All right, now that cyanide then gets washed somewhere into a tank?
A. Yes.
Q. How was the cyanide then treated?
A. With sodium hydrochloride.
Q. What does that do to the cyanide?
A. It oxidizes to cyanide and then to carbon dioxide and nitrogen, it's a two-step type treatment.
Q. As far as you were aware at the time at that point, then would whatever form the cyanide was in after it had been treated, be in a harmless, innocuous form?
A. Yes.
The sludge, whose composition was well known both to plaintiff and to DNR, was disposed of by being trucked away by a DNR-licensed hazardous waste hauler, Burrows Sanitation, which then deposited it in the landfill it operated on a site known as the Mackinder landfill. The site itself had been approved by DNR for this purpose. It was apparently not until just before the DNR closed the site in 1977 that it first determined that toxic material had permeated the soil and penetrated beyond the landfill boundaries.
It is uncontroverted from the EPA documents admitted into evidence that the cause of the ensuing off-site property damage was not simply the fact of the dumping of the sludge as it was *360 then chemically composed. It was rather due to the manner in which the independent contractor, Burrows, had maintained the landfill.[5] Indeed, no claim was made against plaintiff as the prime generator of the sludge until after Burrows had failed to comply with a 1979 DNR order that it remove all sludge from the site.
The position of plaintiff at trial was that while it was aware that its sludge contained hazardous substances, it had no reason to believe that these substances would cause any damage *361 to any property or to the environment. Its president not only so directly asserted but, more to the point, these assertions were supported by the uncontroverted evidence of Du-Wel's compliance with all applicable DNR standards and regulations, DNR's monitoring of its operation, Du-Wel's regular pH testing of the sludge, and its use of a DNR-licensed hauler who removed the sludge to a DNR-approved site. In short, its claim is that while it may be strictly liable under the applicable federal and state legislation as a generator of the hazardous material, that strict liability is completely independent of the question of whether it intended or expected to cause property damage when it contracted with Burrows to deposit the sludge at the landfill which Burrows was operating under state licensing approval.
We are convinced that plaintiff is correct. Strict liability for cleanup under federal and state law is not dependent upon the generator's intent and expectation. Applicability of the occurrence definition and the pollution exclusion clause has, however, everything to do with the generator's intent and expectation. Thus, the fact that plaintiff knew it was generating hazardous waste is not determinative of the coverage dispute. So long as it reasonably believed that the treated waste was being handled in a way which would not cause property damage, it is entitled to coverage pursuant to Michigan law under the "unintended and unexpected" thrust of the policy. Our careful canvas of the record persuades us that there is nothing therein which contradicts the overwhelming evidence that it neither expected nor intended to cause property damage and that it neither expected nor intended that the discharge and deposit of its treated waste by its licensed independent hauler at the landfill would cause property damage. The contrary conclusions of the trial judge are unsupported *362 by the record and conflict with the later declarations of Michigan law. Hence, neither the occurrence definition nor the pollution clause preclude coverage here.

III. THE NAMED-INSURED DEFENSE
As we have noted, the trial court did not consider the so-called named-insured defense after concluding that, under the circumstances here, coverage was in any event barred. Clearly, defendants are entitled to have that issue now determined by the trial judge.
While we leave to the trial judge's discretion the decision as to whether any further proofs or briefs are necessary or appropriate, we do note that the issue was extensively tried and that the judge may opt to proceed to fact-finding on the basis of the record already made. We do not foreclose plaintiff, should it desire to do so, from moving again to amend its complaint.

IV. COUNSEL FEES
R. 4:42-9(a)(6) permits the award of counsel fees "in an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." The motion judge was of the view that applicability of Michigan law to the insurance coverage issues required the applicability as well of Michigan "counsel-fee" law, thereby rendering R. 4:42-9(a)(6) inapplicable to this action. We disagree.
It is a virtually axiomatic principle of conflicts of law that the procedural law of the forum applies even to causes of action governed by a different jurisdiction's substantive law. See, e.g., Heavner v. Uniroyal, Inc., 63 N.J. 130, 135 (1973). And see 1 Restatement, Conflicts of Laws 2d, § 122, p. 350 (1971). Court rules regulating attorney fees are not only clearly procedural but have also expressly been so declared. See Busik v. Levine, 63 N.J. 351, 372-373 (1973), in which Chief Justice Weintraub explained that the subject of counsel fees, despite its substantive dollar impact on litigants, "has been *363 consistently held to be one of practice and procedure within the constitutional grant of power to the Supreme Court." And see Urban League v. Mayor and Council, 115 N.J. 536, 554 (1989), distinguishing "motions for attorney's fees" from "substantive redress."
We recognize Chief Justice Weintraub's further observation that the categorization of a matter as substantive or procedural may be to some extent determined by the purpose for which the inquiry is made and that, in the context of choice of law, balance must be achieved between the forum's interest on the one hand and the avoidance of inappropriate forum-shopping on the other. 63 N.J. at 365-366. While we do not intend to encourage forum-shopping, we do not think it appropriate to foreclose any litigant who properly seeks redress in our courts, whether or not a resident and whether or not our substantive law applies, from the full scope of remedies affordable by our court rules. This jurisdiction views its counsel-fee rules as inextricably bound to the question of access to our courts. They are thus procedural rules in the fundamental sense, and we see no reason to withhold their applicability from any litigant having a nexus with this State sufficient to support the prosecution of the claim here.[6] We therefore reverse the contrary order of the trial court.
The granting of fees under R. 4:42-9(a)(6) is to some degree discretionary as is the amount allowed. If plaintiff ultimately succeeds on the coverage issue and seeks an allowance of fees, defendants will have a right to be heard on any legitimate objections it may have.

*364 V. THE THIRD-PARTY COMPLAINT
Amendment of pleadings, while liberally allowed, nevertheless remains a matter within the sound discretion of the court. It is well-settled that an exercise of that discretion will be sustained where the trial court refuses to permit new claims and new parties to be added late in the litigation and at a point at which the rights of other parties to a modicum of expedition will be prejudicially affected. See Wm. Blanchard Co. v. Beach Concrete Co., Inc., 150 N.J. Super. 277, 299 (App.Div.), certif. den. 75 N.J. 528 (1977). We are satisfied that there was no mistaken exercise of discretion here, and we affirm the denial substantially for the reasons orally stated by the trial judge.
We add only that unlike the situation in Blanchard, supra, the denial here did not have any apparently preclusive effect. Defendants remain free to seek such relief from American Bankers as they may be substantively entitled to. See, e.g., Rooney v. West Orange Tp., 200 N.J. Super. 201 (App.Div. 1985).

CONCLUSION
The judgment appealed from by plaintiff is reversed, and, in respect of the coverage issue, the matter is remanded only for consideration of defendants' defense based on its contention that plaintiff is not the named insured. The interlocutory order denying plaintiff the right to apply for counsel fees pursuant to R. 4:42-9(a)(6) is reversed, and plaintiff may make an appropriate application under that rule if it ultimately prevails in the coverage action. The order challenged on defendants' cross-appeal denying their motion to file a third-party complaint is affirmed.
NOTES
[1] The complaint had also named as defendant Crum and Forster, Inc., a New Jersey corporation, the parent and holding company of the two insurers. The action was dismissed as against it, and no appeal is taken from that order.
[2] Du-Wel had moved just before trial for leave to amend its complaint to add Hartford as a party-plaintiff. The motion was denied on timeliness grounds, and no appeal is taken from that order.
[3] Trial of this matter and resolution of the issues presented were complicated by the fact that for a number of the three-year policy periods involved, neither party was able to produce the original policies, and the question was therefore raised as to when the currently used occurrence definition and pollution exclusion clause were added. Since these two clauses are, however, clearly more restrictive in respect of coverage than earlier versions of the policy, we need not consider when they were first used since we are satisfied that neither of these two clauses preclude coverage.
[4] Indeed, the court in U.S. Fidelity & Guar. Co., supra, 683 F. Supp. at 1155 and 1157, relied on the reasoning of Jackson Tp., Lansco, and the Law Division opinion in CPS Chemical, supra, in construing and applying Michigan law.
[5] Among the findings of facts and conclusions stated in the EPA consent order are the following:

6. The 4-acre Facility is located in a hilly wooded area, approximately one half mile from a trailer park, and within one half mile of private residences, including the residence of the present owners, Respondents Douglas and Georgia Mackinder. All of the nearby residences are on well water, and the home of Respondents Douglas and Georgia Mackinder is serviced by a well which is downgradient directly west of the Facility. Surface runoff and drainage from the Facility is provided by a county drainage ditch which drains into a nearby swamp. This swamp drains into another county ditch that flows into the Paw Paw River located approximately three-quarters of a mile from the Facility. Access to the Facility is unrestricted, and this permits hunters, cross-country skiers, woodcutters, and people picking raspberries, mushrooms and wildflowers to frequent the Facility.
7. From on or about 1970 until sometime during 1977, the Facility was used for dewatering and disposing of treated metal hydroxide sludges, waste coolants, and soluble oils. Wastes were dumped into six (6) unlined disposal lagoon pits, and onto three (3) areas located on the periphery of the lagoon pits (hereafter the spill area, washout area, and cyanide trail area). In the history of the Facility, there are several incidences of berms breaking, washouts occurring, and overflows during heavy rains. An estimated 2,000 to 4,000 gallons of sludge has been lost from the lagoon pits to the surrounding areas during excessive rainfall and snow melt.
8. In 1976, the Michigan Department of Natural Resources sampled the wastes being disposed of at the Facility and found that the copper, chromium, and cyanide levels exceeded the allowable State limits.
* * * * * * * *
10. In 1979, the Michigan Department of Natural Resources instructed Respondent Burrows to remove all sludge from the lagoon pits. Respondent Burrows removed approximately 80 cubic yards of sludge from one of the lagoon pits, but, due to cost considerations, was not able to complete any additional removal.
[6] This suit was apparently brought here because defendant Crum and Forster is a New Jersey corporation. The record does not indicate that it was amenable to process in Michigan. We further note that these defendants unsuccessfully moved for dismissal on forum non conveniens grounds after Crum and Forster was let out.