848 A.2d 843

LACEY MUNICIPAL UTILITIES AUTHORITY, PETITIONER–RE-SPONDENT, v. NEW JERSEY DEPARTMENT OF ENVIRON-MENTAL PROTECTION, ENVIRONMENTAL CLAIMS ADMIN-ISTRATION, SPILL COMPENSATION FUND, RESPONDENT–APPELLANT, AND ESTATE OF GEORGE DJAMBINOV, RE-SPONDENT/INTERVENOR–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 21, 2004—Decided May 19, 2004.

262

Before Judges KING, LISA and S.L. REISNER.

*Stuart J. Lieberman,* argued the cause for appellant Estate of George Djambinov (*Lieberman & Blecher,* attorneys; *Mr. Lieberman,* of counsel; *Julie A. Hummel,* on the brief).

*Jerry J. Dasti,* argued the cause for respondent Lacey Municipal Utilities Authority (*Dasti, Murphy, McGuckin, Ulaky, Cherkos & Conners,* attorneys; *Mr. Dasti,* on the brief).

*Peter C. Harvey,* Attorney General, attorney for appellant New Jersey Department of Environmental Protection (*Patrick DeAlmeida,* Deputy Attorney General, of counsel; *Mark Oshinskie,* Deputy Attorney General, on the statement in lieu of brief).

The opinion of the court was delivered by

S.L. REISNER, J.A.D.

Appellant Estate of George Djambinov appeals from the decision of an arbitrator ordering the New Jersey Spill Compensation Fund (Spill Fund) to reimburse Respondent Lacey Municipal Utilities Authority the sum of $2,128,796 plus interest for the cost of constructing a portion of its water-supply system. Having reviewed the record and the detailed decision of the arbitrator, we affirm.

## I

We begin by reviewing the procedural history. In response to the contamination of private wells in the 1980s in Lacey Township (Township), the Lacey Municipal Utilities Authority (LMUA) constructed a water-supply system in an area of the Township designated as "Zone 12." In 1991, the LMUA filed a claim with the New Jersey Department of Environmental Protection (DEP), under the Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.24 (Spill Act), to recover the costs of expanding the LMUA's system into Zone 12.

The DEP initially denied the claim on statute-of-limitations grounds, but the claim was later reinstated following the LMUA's successful appeal. *Lacey Mun. Utils. Auth. v. New Jersey Dep't. of Envtl. Prot.,* 162 *N.J.* 30, 39–40, 738 *A.2d* 955 (1999). At that point the Estate of George Djambinov (Estate), a party identified by the DEP as being potentially responsible for the contamination in Zone 12, intervened and requested arbitration. Through the Office of Administrative Law (OAL), the matter was assigned to an administrative law judge who acted as arbitrator pursuant to *N.J.S.A.* 58:10–23.11n.

After five days of hearings, the arbitrator rendered a detailed decision concluding that the water supply in Zone 12 had been contaminated by a discharge occurring after the effective date of the Spill Act, that the LMUA acted reasonably in extending its water supply system to Zone 12, that the costs were reasonable, and that the Spill Fund must reimburse the LMUA for approximately two million dollars in construction costs. This appeal followed.[1]

## II

A review of the facts is necessary to understand our decision. On June 4, 1971, the Township passed an ordinance creating the LMUA. Two of the stated purposes of the LMUA were the provision of "sewage collection and disposal service" to the Township and the "provision and distribution of an adequate supply of water for the public and private users of the Township." During the 1970s, the LMUA fulfilled the first of these purposes by constructing a "sanitary sewer collection system" in the Township. Action in furtherance of the second purpose did not begin until the mid 1980s, when many of the private wells in the Township became contaminated by pollutants.

Beginning in 1959, George Djambinov owned and operated the Lacey Amoco Service Station (Lacey Amoco), on Route 9 in the Township on the western edge of the area variously referred to in the record as Zone 12, Constitution Avenue, or Riviera Beach. Djambinov owned the Lacey Amoco site, along with its underground storage tanks, lines and pumps, from 1959 to 1970, when he sold the tanks, lines and pumps to Seacoast Oil, Inc. (Seacoast). In 1984, he sold the remainder of the site and its appurtenances to Seacoast.

---

[1] DEP and the Estate filed notices of appeal, and the appeals were consolidated. The Estate filed a brief. DEP, which did not play an adversarial role in the hearings below, filed a statement in lieu of brief.

The operations performed at Lacey Amoco from 1959 to 1990, first by Djambinov and later by Seacoast, included dispensing gasoline and diesel fuel and repairing automobiles. There were five underground storage tanks beneath the station. Of those five tanks, three gasoline tanks and a diesel oil tank had been installed in 1966, while a waste oil tank had been installed in 1983.

In August 1986, the tanks were emptied and relined with an epoxy compound. According to the LMUA's engineering expert, such relining is "a procedure to help with the integrity of the tank, either to plug existing leaks or to help extend the life of the tank in terms of containing material."

In 1984, well contamination was found in a section of the Township that would subsequently be designated as Zone 1. The contamination was attributed to a gasoline service station, but not to Lacey Amoco. Zone 1 is located about one to three miles to the west of Zone 12.

The ground water contamination in Zone 1 raised public concern. In response, the DEP delineated a ground water impact area (GWIA)[2] for Zone 1 and, in 1985, authorized an engineering firm, R.E. Wright Associates (Wright), "to perform an analysis to evaluate alternate water supplies for the GWIA known as Zone 1." Wright issued a report later in 1985, primarily recommending to the DEP that the Township build a "central public water supply and distribution system encompassing the entire affected and threatened areas." A Township official summarized Wright's recommendation, testifying that "the most feasible way to resolve the problem as far as the residents were concerned is to build a public water supply system in that area," meaning Zone 1. There was no community water-supply system in the Township at that time.

---

[2] A ground water impact area, also known as a Spill Fund Claims Area is "the geographic area delineated by the [DEP], consisting of the currently known extent of ground water pollution determined by the Department pursuant to *N.J.A.C.* 7:1J–3.7, combined with the most probable pollution migration zone determined by the Department pursuant to *N.J.S.A.* 7:1J–3.8." *N.J.S.A.* 7:1J–3.6.

In June 1986, the LMUA authorized an engineering firm, Remington and Vernick (Remington), to study the feasibility of constructing a central public water-supply system in Zone 1. The feasibility study was evidently favorable; construction of the system in Zone 1 began in August 1986 and was still ongoing in October 1987.

Also in 1986, but prior to any decision to construct the water-supply system in Zone 1, the LMUA developed a Water System Master Plan (master plan) for the construction of a central public system to distribute water throughout the entire Township. The master plan comprised four construction phases, the first of which involved building in an area that included both Zone 1 and the area that would later be designated as Zone 12. At the arbitration hearing, a DEP official testified that the existence of a master plan in a community would not preclude DEP from considering that community's Spill Fund claim for building a central public water-supply system. This is so, according to the official, because such comprehensive long-range plans are commonly made by municipalities and do not "necessarily mean that they [the municipalities] are going to build something right then."

On October 8, 1986, the Township entered into a service contract with the LMUA to have the LMUA supply, treat, and distribute potable water throughout the Township. The immediate impetus for this contract was the LMUA's need for a revenue source so that it could procure financing for the then-ongoing water-supply system construction "within a portion of the Township," apparently Zone 1.

Meanwhile, the DEP and the Ocean County Health Department continued to test groundwater in the Township to determine whether the contamination had extended beyond Zone 1. In 1986, while construction of the water-supply system was proceeding in Zone 1, additional well contamination was discovered in a nearby area designated Zone 2; the LMUA responded by extending its construction into that area to supply residents with potable public water. Thereafter, but still in 1986, well contamination was

discovered in another nearby area, Zone 6; the LMUA extended water-supply system construction into that area also.

In October 1986, well contamination was found at two private residences on Constitution Drive in Zone 12. There was major public concern, as some residents were instructed not to use their well water for bathing, cooking or drinking and were directed to take showers at the local high school. At that point, the Township and the LMUA "looked at the potential of expanding the water into [Zone 12]." Meanwhile, the DEP and other "outside agencies" continued to test the Township's groundwater.

On April 21, 1988, the Township held a public meeting in which it first authorized the LMUA to extend the water-supply system then under construction in other zones into Zone 12. According to a Township official, the Township thought it was "playing catch up" and "chasing contamination" in an effort "to alleviate the problems that the residents had in that area" by bringing "a safe supply of drinking water" to them. The official testified that there was "no thought process of expanding the water system" beyond the bounds dictated by the ongoing discovery of groundwater contamination. Nevertheless, at the same public meeting in April 1988, the Township resolved to authorize the LMUA to expand the construction of the water-supply system to include the entire Township.

At that juncture, in June 1988, the LMUA authorized Remington to conduct a feasibility study for the expansion of the water-supply system throughout the entire Township. Remington's resulting report recommended that the expansion be undertaken because "a central public water supply system is necessary to protect the public health, safety and welfare of the residents" of the Township.

In 1989, the LMUA obtained bond financing for its construction of the water-supply system throughout the Township. Construction was completed in Zone 12 in 1990, at a total cost of $5,280,632. The LMUA filed a Spill Fund damage claim with the DEP on March 4, 1991, seeking reimbursement for that sum.

Meanwhile, DEP continued to investigate to identify the source of the well contamination in Zone 12 and in other areas of the Township. In January 1990, apparently at DEP's direction, Seacoast installed and drew samples from five monitoring wells at the Lacey Amoco site. At a point in time not apparent from the record, DEP learned that Seacoast's "upgradient well" did not exhibit any contamination, while the other four "downgradient" wells showed heavy contamination of the groundwater with petroleum products. The general direction of the groundwater flow from Lacey Amoco was toward the contaminated private residential wells in Zone 12.

On May 2, 1991, about two months after the LMUA filed its Spill Fund damage claim, the DEP issued a report establishing a GWIA for Zone 12. The report noted that ninety wells had been tested in Zone 12 and that fifteen of those wells, or twenty-three percent of the total, showed levels of contaminates that exceeded safety levels. The report also indicated that "[t]his density of polluted wells is below our current guideline (25%) for the delineation of a GWIA. However, because of the high level and widespread nature of similar pollutants in the currently known extent, we decided to proceed with the delineation of a GWIA." The GWIA did not indicate a source for the well contamination in Zone 12.

From 1990 to 1993, the DEP conducted several "remedial studies" concerning Lacey Amoco. The result was that, in January 1993, the DEP removed the five underground tanks from beneath Lacey Amoco, along with over 4000 tons of contaminated soil. On July 23 and November 30, 1993, the DEP issued memoranda which indicated that the engineering aspects of the LMUA's Spill Fund damage claim were sound and did not present any impediment to payment of the eligible portion of the claim to the LMUA. However, the DEP denied the claim on statute-of-limitations grounds in January 1995, and further DEP action on the claim was tabled until the Supreme Court remanded the matter on

October 28, 1999. *Lacey, supra,* 162 *N.J.* at 39–40, 738 *A.*2d at 960–61.

On August 15, 1996, DEP issued an "Unknown Source Case Summary," addressing the well contamination in Zone 12. In this report, DEP noted that the sampling of monitoring wells had confirmed the release of leaded and unleaded gasoline to the groundwater at Lacey Amoco in high concentrations. The report concluded that Lacey Amoco "has been identified as the source of the potable well contamination" in Zone 12.

On February 11, 1998, DEP issued a report indicating that it had generated a groundwater model to simulate the movement of contamination from Lacey Amoco through the GWIA in Zone 12. The result of this simulation indicated that, from the date of its discharge into the ground, any contamination from Lacey Amoco could reach the affected wells in Zone 12 at times ranging from three years for the nearest wells to ten years for the farthest ones.

In March 2001, Remington issued a report on behalf of the LMUA, analyzing the estimated period of discharge from Lacey Amoco into the GWIA in Zone 12. Remington concluded that "the discharge that impacted the potable well source [in Zone 12] occurred after the Spill Compensation and Control Act was promulgated on April 1, 1977."

Remington based its conclusion on the fact that the gasoline tanks had been installed in 1966 and that the usable life span of such tanks is usually more than eleven years. Remington also based its conclusion on the DEP's three-year estimate of the travel time for contaminated groundwater from the Lacey Amoco site to reach the nearest affected wells in Zone 12. Because contamination was discovered in those wells in 1986, Remington opined that the offending discharge from Lacey Amoco could not have occurred before 1983.

Also in March 2001, Remington issued a report on behalf of the LMUA analyzing alternatives to the installation of a central public water system in the GWIA in Zone 12. Its report relied heavily

upon the 1985 report which Wright prepared for DEP. Remington concluded that there were only two viable alternatives to resolve the contamination problem in Zone 12: installing individual deep-water wells at each affected residence or "constructing a community supply system with a deep aquifer source." Remington opined that the individual wells would cost much more than a deep-water community supply system and thus recommended the latter. Because such a system had been completed in Zone 12 in 1990, Remington's recommendation confirmed the correctness of what the LMUA had already done.

On March 6, 2001, Remington filed a report on behalf of the LMUA addressing whether the LMUA's Spill Fund damage claim was in compliance with the National Contingency Plan (NCP). Remington concluded that the NCP was intended to apply "strictly with emergency remediation of a major environmental discharge, primarily to protect local waters and wildlife." Thus, Remington indicated that "it is our professional opinion that the National Contingency Plan requirement does not apply to the Zone 12 Claim. At worst, the Zone 12 Claim certainly is not in conflict with any of the National Contingency Plan guidelines."

In June 2001, the Estate's engineering expert, Patrick J. Lawler (Lawler), issued a report in which he challenged the extent of the GWIA established by the DEP in 1991. Lawler asserted that the GWIA was overstated because many of the wells designated as contaminated by the DEP either were not polluted by gasoline products attributable to Lacey Amoco or were only minimally so. By eliminating those contaminated wells from his calculations in this manner, Lawler reduced the number of residences affected by contamination to nine, and his proposed GWIA was diminished in turn to "less than 10% of the GWIA as delineated by NJDEP" in 1991.

In contrast to Lawler's calculations, on July 20, 2001, the DEP issued an in-house memorandum, in which it amended its calculation of the GWIA in Zone 12, effectively increasing its size. Essentially, DEP changed one of the variable quantities, the

"hydraulic gradient," in its calculation of the GWIA. The DEP increased the value of the hydraulic gradient from .0015, which had been assumed to be accurate in the 1991 GWIA calculation, to .0025, which is a value that was subsequently derived from empirical evidence in the Zone 12 region.

The result was to reduce the predicted groundwater travel times for contaminants emanating from Lacey Amoco to reach the affected wells in Zone 12 from the three to ten years estimated earlier by the DEP to 368 to 644 days. Thus, the DEP determined, based upon new information involving the hydraulic gradient value, that the contaminants and the underlying groundwater were moving faster than previously predicted and that they could reach the nearest wells in little more than a year.

On March 8, 2002, in apparent response to this revised groundwater flow estimate by the DEP, Remington filed a report on behalf of the LMUA. Utilizing the DEP's revised hydraulic gradient value, Remington calculated that the DEP's "1991 GWIA for Zone 12 was actually undersized" because the contaminants were moving more rapidly during the five-year period utilized under the calculation. According to Remington, the GWIA based upon the revised hydraulic gradient value extended "800 feet easterly over the limits of the state's 1991 GWIA." Therefore, Remington opined that an additional $219,530 in reimbursable Spill Fund damages were attributable to the water-supply services necessitated by the revised GWIA.

On March 18, 2002, the LMUA's auditor sent a letter to the LMUA's counsel, advising him of a revision in the reimbursable portion of the estimated cost of constructing the water-supply system in Zone 12; the revision reflected Remington's recommended revision and expansion of the GWIA. According to the auditor, when the $219,530 calculated as additional reimbursable Spill Fund damages by Remington is added to the portion of the construction costs already deemed eligible for reimbursement under the Spill Fund, the revised reimbursable costs total $2,128,796 as of March 31, 2002. Additionally, the auditor stated

that additional interest costs would accrue at the rate of $136 per day from April 1, 2002.

After the LMUA served Remington's amended report in March 2002, there was a break in the hearings until May 13, 2002. During this hiatus, the Estate had an opportunity to re-depose Remington's engineer Terrence Vogt, before he testified on May 13 concerning the impact of the expanded GWIA.

### III

The Spill Fund provides compensation "for all cleanup and removal costs and all damages resulting from a discharge of hazardous substances. *N.J.S.A.* 58:10–23.11g(a)." *Handy & Harman v. Borough of Park Ridge,* 302 *N.J.Super.* 558, 563, 695 *A.*2d 747, 750 (App.Div.), *certif. denied,* 152 *N.J.* 10, 702 *A.*2d 349 (1997). If a party, including a potentially responsible party such as the Estate, contests the amount or validity of the claim and requests arbitration, the dispute is referred to an arbitrator whose decision may be appealed to the Appellate Division. *Ibid.*; *N.J.A.C.* 7:1J–8.3(a)(3). On appeal, the decision of a Spill Fund arbitrator will not be disturbed so long as it "was not arbitrary, capricious, or unreasonable; was supported by sufficient credible evidence in the record; and did not violate the legislative policies expressed or fairly implied in the statutory scheme administered by the Spill Act." *Ibid.*

The Estate's first contention is that the arbitrator erred in determining that groundwater contamination in Zone 12 was caused by a discharge occurring after April 1, 1977, the effective date of the Spill Act. Since the "Spill Fund cannot be held liable ... for damages caused by discharges occurring before the effective date of the Spill Act," *Handy & Harman, supra,* at 565, 695 *A.*2d at 751, a claimant must prove by a preponderance of the evidence that the spill occurred after that date. *Id.* at 562, 695 *A.*2d at 749; *N.J.A.C.* 7:1J–2.3.

■ As the arbitrator discussed in detail in his decision, the LMUA presented unrebutted testimony from its engineering expert that Lacey Amoco's gasoline tanks had been installed as new in 1966 and that such tanks typically do not leak or fail within the first fifteen to twenty years of operation. This evidence supports the arbitrator's finding that the tanks did not fail before April 1, 1977, and that any discharge from the tanks occurred after that date.

Additionally, there was evidence from a DEP engineering expert that the "travel time" for groundwater from the Lacey Amoco site to the nearest contaminated wells was only 368 days. The record reflects that the earliest reports of well contamination in Zone 12 were made in October 1986. When these two circumstances are coupled, the timing of the discovery of well contamination in Zone 12 permits a reasonable conclusion that a discharge from Lacey Amoco occurred at some point in the mid–1980s, well after April 1, 1977.

Finally, there was evidence that Seacoast relined the gasoline tanks with epoxy in August 1986. According to uncontradicted testimony from Terrence Vogt, the LMUA's engineering expert:

[i]t's our experience ... that owners [of underground storage tanks] do not ... get out of bed one day and decide I'm going to line my tanks because I want to be a good neighbor. Usually in the absence of a mandate [by the DEP], the purpose of having a tank lined or taken out of service is that you have knowledge that you're losing inventory [i.e., leaking gasoline]. In this case, you have leaking tanks.

This evidence of tank leakage and relining in 1986, coupled with evidence that the subsequent remediation of the Lacey Amoco site by the DEP in 1993 required the removal of over 4000 tons of gasoline-contaminated soil, adequately supports the conclusion that there was a major leakage of petroleum products at the Lacey Amoco site in the mid–1980s.

We conclude that the arbitrator's decision was supported by substantial credible evidence. The fact that the Estate's expert, Patrick Lawler, presented testimony that the contamination came from sources other than Lacey Amoco does not change our conclusion. It was the arbitrator's role to weigh the conflicting

evidence and determine which experts were more credible. He chose to credit the claimant's experts, a determination to which we defer. *In re Taylor,* 158 *N.J.* 644, 656, 731 *A.*2d 35, 41 (1999).

The Estate's reliance on *Handy & Harman, supra,* is misplaced. In that case, an arbitrator denied a township's Spill Fund claim because, while the township presented evidence that well contamination had been detected in December 1992, it presented no evidence that the discharge leading to that contamination had occurred after April 1, 1977. According to the arbitrator in *Handy & Harman,* "the date on which the contamination is detected is not a reliable indication that the discharge occurred at a time in close proximity thereto." *Id.* at 562, 695 *A.*2d at 749. The township's claim thus failed because of an absence of proof concerning the date of the discharge.

The situation here is different, because there is proof that the first discharge of pollutants at the Lacey Amoco site occurred well after April 1, 1977. This proof derives from the installation of new tanks in 1966, the relining of the tanks in 1986, and the revised "travel time" calculation showing that contaminants could move from the Lacey Amoco site to the nearest wells in Zone 12 in as few as 368 days.

The Estate also relies upon *Handy & Harman* for the proposition that the "burden is on the claimant to prove that the *first* discharge occurred after April 1, 1977: not simply any discharge, but the first." *See, Handy & Harman, supra,* 302 *N.J.Super.* at 562, 695 *A.*2d at 749. Essentially, the Estate asserts that the LMUA failed to prove that the contamination was not the result of a continuing pre-Spill Act discharge, that is, a discharge occurring before April 1, 1977, but continuing thereafter.

In his decision, the arbitrator rejected this contention, stating that:

[t]he intervenor [the Estate] argues further that there really is no proof that there ever was a discharge from Lacey Amoco, and, even if there was, other pre-Act discharges may have preceded it. The intervenor would have petitioner [the LMUA] eliminate every theoretical possibility to establish entitlement, but that is not its burden. The testimony and documentary record establish that it is more

likely than not that the primary discharge originated from Lacey Amoco long after the Spill Act was adopted. To say otherwise we must suppose that well contamination existed for years before it was discovered, the five USTs [underground storage tanks] and 4,000 tons of soil were removed from the site for mysterious reasons, or that other discharges about which we know little occurred first and caused the contamination that led to the creation of the GWIA.

We agree. The arbitrator properly recognized the difficulty inherent in proving a negative. That is, the arbitrator recognized the difficult task that the LMUA would face if it were required to present proof that the massive soil contamination at the Lacey Amoco site was *not* the result of a pre-Spill Act discharge. As the arbitrator correctly observed, the LMUA did not have to bear that difficult proof burden, but rather was only "required to prove that it had suffered damages as a result of a post-[Spill] Act discharge." *Handy & Harman, supra,* 302 *N.J.Super.* at 568, 695 *A.*2d at 752. The LMUA met this proof burden when it presented evidence showing that it was more likely than not that the contaminant discharge at Lacey Amoco occurred in the mid–1980s.

■ The Estate's related attack on the extent of the GWIA, which in turn determined the amount of the LMUA's claim, is similarly without merit. Resolution of this issue required the arbitrator to resolve a dispute between expert witnesses. He credited the testimony of the LMUA's expert Vogt, which in turn relied on DEP's reports concerning the size of the GWIA. We find no basis in the record to disturb the arbitrator's determination.

Likewise, we find no merit in the Estate's objection to the LMUA's amendment of its claim during the pendency of the hearings. The LMUA amended the claim in response to a DEP report prepared by Robert Canace; that report was not provided to either party until March 2002. By March 8, 2002, LMUA's expert engineer Vogt had issued a revised report. The Estate was permitted to re-depose Vogt in order to meet the amended claim. Further, as the arbitrator ruled, the LMUA needed to present the additional evidence as to the size of the GWIA to rebut the Estate's efforts to minimize its size:

Finally, we must decide on a dollar amount, and neither the arithmetic nor the engineering calculations upon which the math rests are in question. The issue turns on the appropriate size of the GWIA in relation to overall costs in Zone 12. The intervenor sought to shrink the GWIA and petitioner initially argued that [DEP's] mapping had long since settled the question. When the intervenor was permitted to submit proofs on the point, petitioner was freed to argue that the GWIA was actually larger than previously thought, a position bolstered by Mr. Canace's second memo.

The Estate did not object to Vogt's testimony concerning the expanded GWIA, and we perceive no inequity in the arbitrator's permitting either the testimony or the amended claim.

We also find no merit in the Estate's contention that *N.J.A.C.* 7:1J–6.4 precluded amendment of the claim. Section 6.4 of the Spill Act regulations provides that:

[a] claimant may amend a claim, or a response to the Department's [the DEP's] request for information, with respect to the nature or extent of the damages, the cause of the damages, the amount of the claim, or any other information relevant to the claim, until the occurrence of the earliest of the following: the approval of the claim by the administrator; the denial of the claim by the administrator; or the agreement to a settlement among a claimant and one or more potentially responsible parties.

At the time of the hearings the Spill Fund had neither approved nor denied the LMUA's claim, nor had the claim been settled. Consequently, *N.J.A.C.* 7:1J–6.4 did not preclude amendment of the claim to conform to the new evidence obtained from DEP during the hearings.

■ The Estate's additional objections, that the LMUA did not satisfy the terms of the NCP, that extending the water-supply system was not the most cost-effective solution to the contamination in Zone 12, that reimbursement for the extension of a water system is not authorized by the Spill Act, and that the LMUA has no claim because its ratepayers have paid for the extension, are all plainly without merit and require little discussion. These contentions were cogently addressed in the arbitrator's decision:

Next we consider whether petitioner satisfied the terms of the NCP, and the parties spent little energy on this point. The Spill Act requires that cleanup and removal efforts comply with the NCP "to the greatest extent possible," *N.J.S.A.* 58:10–23.11f. Mr. Vogt testified credibly that the NCP generally contemplates large-scale remediation efforts and that the Zone 12 GWIA does not qualify.

Nevertheless, he testified that the work performed is consistent with that plan for all of the reasons previously discussed. The intervenor presented no testimony regarding the NCP and points to the section requiring "cost-effective" solutions to argue again that homeowners in Zone 12 with contamination could simply have invested in deeper wells. To the extent that the NCP is an issue here it is satisfied for the same reasons that the claim is generally acceptable; *i.e.*, that the work done was a reasonable response to the contamination found.

. . . .

The intervenor argues also that petitioner was not damaged by a discharge; homeowners were damaged and petitioner is not entitled to any reimbursement from the Spill Fund. Moreover, the ratepayers are in the process of paying for the water supply system and as such payment from the fund will be a windfall. . . . [These arguments] are without substantial merit. The regulatory scheme specifically recognizes water system claims that extend supply into areas where existing sources have been tainted, *N.J.A.C.* 7:1J-3.2. The Spill fund is then strictly liable to reimburse these damages, *N.J.S.A.* 58:10-23.11g. The bonds and the payments by the ratepayers are simply practical means for moving ahead as questions of responsibility are settled. The only testimony on the point came from Ms. McLung [sic], who confirmed that the Spill Fund commonly pays such water supply system claims.

We are satisfied that the arbitrator's decision on all of these points was supported by substantial credible evidence and correctly construed the Spill Act and its implementing regulations. We note that the former Spill Fund Claims Administrator Anne Marie McClung testified that the Spill Fund routinely pays claims by water utilities for expanding their systems into areas with contaminated water supplies. According to her testimony, the fact that ratepayers initially pay the cost of these projects does not bar Spill Act reimbursement to the utility under *N.J.A.C.* 7:1J-2.4(b), which prohibits double recovery of costs.

The Fund's construction of *N.J.A.C.* 7:1J-2.4(b) is consistent with the terms of the regulation and with common sense. Section 2.4(b) by its wording is aimed at recovery from insurance policies, other clean-up funds such as the Hazardous Discharge Site Remediation Fund, or potentially responsible parties. *See, N.J.S.A.* 58:10-23.11v (Spill Act provision that "no person who receives compensation for damages or cleanup costs pursuant to any other State or Federal law shall be permitted to receive compensation for the same damages or cleanup costs under this act.") Nothing in the language of section 2.4(b) suggests that it

applies to payments by ratepayers. The arbitrator properly credited the LMUA's contention that in seeking reimbursement from the Spill Fund the LMUA represents its ratepayers, and the Spill Fund award will be used to provide rate relief.

## IV

We conclude that the arbitrator's award to the LMUA was supported by substantial credible evidence and represented a proper construction of the Spill Act and implementing regulations.

Affirmed.