14 A.3d 780

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTEC-
TION AND ACTING ADMINISTRATOR, NEW JERSEY SPILL
COMPENSATION FUND, PLAINTIFFS–APPELLANTS, v. OFRA
DIMANT, RITA LAPINSKI, CHARLES ZACCARDI, EVELYN M.
ZACCARDI, GARY C. ZACCARDI, MICHAEL ZACCARDI, AND
ZACCARDI'S CLEANERS, A NEW JERSEY PARTNERSHIP,
DEFENDANTS, AND CHOUCHAN SAMMAN, RIAD SAMMAN,
AND SUE'S CLOTHES HANGER, INC., DEFENDANTS/THIRD–

PARTY PLAINTIFFS–RESPONDENTS, v. BHARAT K. SHAH, PRITI B. SHAH, AND PTR, PTB, PTM CORP., THIRD–PARTY DEFENDANTS–RESPONDENTS, AND LOUIS SCHARLAT, CONCHETTA SCHARLAT, ANTHONY CHIRICO, DONALD H. HICKMAN, FLOYD S. RANDOLPH, AND CLEANING VILLAGE OF SOMERSET, INC., THIRD–PARTY DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued March 1, 2011—Decided March 18, 2011.

532

Before Judges PARRILLO, YANNOTTI and ESPINOSA.

*Mark D. Oshinskie,* Deputy Attorney General, argued the cause for appellants (*Paula T. Dow,* Attorney General, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Mr. Oshinskie,* on the brief).

*George R. Hardin* argued the cause for respondents Chouchan Samman, Riad Samman, and Sue's Clothes Hanger, Inc. (*Hardin, Kundla, McKeon & Poletto, P.A.,* attorneys; *Mr. Hardin,* of counsel and on the brief; *Cynthia Lee,* on the brief).

*Jacob Grouser* argued the cause for respondents Bharat K. Shah, Priti B. Shah, and PTR, PTB, PRM Corp. (*Hoagland, Longo, Moran, Dunst & Doukas, L.L.P.,* attorneys; *Marc S. Gaffrey* and *Alan Dunst,* of counsel and on the brief; *Cristyn D. Clifton,* on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

Plaintiffs, the Department of Environmental Protection (DEP) and the Administrator of the New Jersey Spill Compensation Fund, filed a suit for contribution pursuant to the Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.24 (the Spill Act), alleging that defendant, Sue's Clothes Hanger, Inc., a Laundromat and dry cleaner, was responsible for ground-water contamination on various properties in Bound Brook. After a bench trial, the judge ruled that plaintiffs had not proved a nexus between a discharge by defendant and the contamination, and that plaintiffs

could not amend their complaint to add third-party defendants, previous operators of the site, as direct defendants. Plaintiffs appeal. We affirm.

In late 1988 and early 1989, an investigation by the Middle Brook Regional Health Commission (MBRHC) uncovered contamination in many of the residential potable water wells in Bound Brook's Longwood Avenue section. The main contaminant was perchloroethylene (PCE), a volatile organic compound that evaporates quickly when exposed to air, and is used in the dry-cleaning industry and as a degreaser in the automobile service and other machine shop industries. Also present were: (1) trichloroethylene (TCE), used as a dry cleaning agent, metal degreaser, and solvent for fats and paints; (2) dichloroethylene (DCE), used as a refrigerant and solvent for fats; and (3) chloroform. TCE and DCE are also byproducts of degrading PCE.

The Longwood Avenue Groundwater Contamination Area, consisting of 365 acres, is bordered by West Union and Longwood Avenues. Rita Lapinski owned a three-unit strip mall fronting on the south side of West Union Avenue. Defendant occupied one of these units. Zaccardi's Cleaners occupied a building immediately to the east of the Lapinski building, also on the south side of West Union Avenue. To the west was the site of a former ExxonMobil (Mobil) gasoline station. The contaminated wells were to the south and southeast of West Union Avenue and the Mobil, Lapinski and Zaccardi properties. Other dry cleaning businesses, Michael James Cleaners and Bound Brook Cleaners, were located east of Zaccardi's Cleaners. Also near this area were two federal Superfund sites, the American Cyanamid contamination area and the Brook Industrial site.

The Lapinski building was built in the 1930s, and at least one of the three units had been home to a laundry and dry cleaning establishment since the 1950s. From 1985 through 1987, third-party defendants, Bharat Shah and Priti Shah (the Shahs), operated a Laundromat and dry cleaner called "The Clothes Hanger" at the site eventually taken over by defendant. The Shahs used two

Speed Queen dry cleaning machines as part of their operation. These were small non-professional machines that could hold a clothing capacity of eight to fifteen pounds. The machines used PCE as the cleaning solvent. The PCE went into the machine and cleaned the clothes. After the clothes absorbed some of the chemical; the machine dried them, the heat vented through a pipe to the outside of the building, some of the PCE evaporated as a result of the heating and venting process, and any unused liquid PCE fell back to the reservoir under the machine. It was a "closed loop" system.

In May 1987, the Shahs sold the business to Chouchan Sammans and Riad Sammans (the Sammans), who changed the name to "Sue's Clothes Hanger." They kept the self-serve Laundromat as the dominant business and operated the dry cleaning machines only a couple times a week for drop-off laundry.

The late 1988–early 1989 combined investigation by MBRHC and DEP into the source of the well contamination focused only on defendant's business and Zaccardi's Cleaners. Investigators never took samples from Michael James Cleaners, the largest dry cleaner, because it used a petroleum-based solvent, although underground tanks of "solvent" and petroleum were found leaking on its property soon afterwards.

Because defendant used PCE as a solvent in its dry cleaning process, investigators took various samples from two separate locations inside and outside the store. First, they sampled fluid coming out from behind the two Speed Queens and going into a grated pit in the floor inside the building. Tests of the flow showed that it contained PCE and TCE at levels above the maximum contamination levels (MCL) set by DEP regulations. Investigators then performed a dye test to see whether the fluid in the pit had drained into the groundwater. They only discovered the fluid in the borough's sanitary sewer system. Since sewer lines are usually not a source of contamination, the investigators concluded that the discharge of "dry cleaning solution" was "not being injected directly into the ground."

Investigators also took samples from a slowly leaking pipe coming out of the back of the building. The liquid had a "sweet, pungent" smell. The pipe, which was about five feet off the ground, dripped onto the asphalt of the narrow driveway and flowed away from the building. PCE can erode asphalt over time, but investigators could not recall if the asphalt had been cracked or eroded. Tests showed that the samples contained PCE and TCE above the MCL.

Defendant discontinued use of the Speed Queen dry cleaning machines in early 1989. Defendant also sealed the grated hole behind the machines and dismantled and sealed the discharge pipes, effectively limiting the period during which there was a possibly contaminating leak from defendant's operation from May 1987 to early 1989.

Over a decade later, in 2000, DEP assigned Lynn Vogel, a geologist and an expert on groundwater transport, to investigate and find the source(s) that had contaminated the Longwood Avenue Groundwater Contamination Area.[1] From her research, Vogel found that the potable wells with the highest levels of PCE contamination in 1988 and 1989 had been located directly behind defendant and Zaccardi's Cleaners. Wells with the lowest levels had been to the east of those stores.

Concentrating on those businesses, Vogel collected new groundwater and soil samples. The soil samples from Lapinski's property revealed PCE and its degradation-by-products, TCE and DCE, but at almost undetectable levels. The groundwater samples showed PCE at levels above the MCL and, surprisingly, methyl tertiary butyl ether (MTBE), a gasoline additive. Vogel saw no pipe coming out of the wall and dripping onto the driveway. Instead, she saw two much higher pipes that were venting air, and some patched concrete holes. Vogel concluded that "The Clothes

---

[1] By that time, at Spill Fund expense, most of the residences with contaminated wells had installed treatment filters or had connected to the local water utility's new water lines.

Hanger is considered the primary source of the Longwood Avenue Ground Water Contamination." However, she also opined that the presence of the PCE degradation-by-products, TCE and DCE, in the soil samples closest to the building indicated that "the contamination has been there for a long time [prior to 1988], and it's degrading into its lesser compounds." [2]

Matthew J. Mulhall, defendant's expert in geology and hydrogeology, also agreed that the contamination had been longstanding and opined that there had not been "sufficient time" between the Sammans's opening of Sue's Clothes Hanger in June 1987 and the detection of contaminants beneath the impact area in March 1988 for the contaminants to have migrated from their business operation to the first or nearest affected residential wells. "Nine to ten months is not sufficient time for PCE, TCE, or trans–1, 2–DCE to migrate from Sue's Clothes Hanger to these residential wells." Instead, he concluded that the area's contamination came from the former Mobil station, which was to the west and uphill from the Lapinski building. "The contaminant migrates away from the source area through the aquifer system ... [B]asically you will see an elliptical shape ... following the direction of groundwater flow." In fact, the monitoring wells on the Lapinski building's eastern border with the Mobil station showed higher PCE contamination and smelled of gasoline.

Vogel and Mulhall also had very different viewpoints about the direction of the groundwater flow in the area. Vogel testified that the pattern of polluted wells showed that the groundwater flowed to the south, southeast. Mulhall disagreed, and opined that groundwater flowed to the south, southwest, following the topography. The 2000 samples from the contaminated wells showed that the contamination had spread slightly farther to the west, and

---

[2] The soil and groundwater samples taken from Zaccardi's Cleaners proved that it also had contributed to the groundwater contamination. The discharges from its outside steam pipe sent condensation onto the pavement, which was cracked and eroded. However, the 2000 samples contained less PCE and TCE than what was detected in defendant's samples.

not to the east. Nevertheless, both experts testified that groundwater could flow in different directions once it hit bedrock.

In December 2004, plaintiffs filed a complaint in the Law Division against defendant and others, including Rita Lapinski, the Sammans, and Zaccardi's Cleaners, as well as individual Zaccardi defendants (the Zaccardis), seeking contribution for costs incurred in relation to environmental remediation of the Longwood Avenue Groundwater Contamination Area. Defendant, together with its owners and operators, the Sammans, filed an answer, a cross-claim for contribution and indemnity, and a third-party complaint against other prior operators and owners of the alleged contamination sources, including the Shahs, who sold the business to defendant.[3] Lapinski and the Zaccardis eventually settled. Thereafter, defendant and the Sammans filed for bankruptcy protection, but only the Sammans received a judgment of discharge from the bankruptcy court.

The case proceeded to a bench trial only against defendant, near the end of which plaintiffs formally moved for leave to file a direct action against the Shahs, the third-party defendants. The judge denied the motion. At the conclusion of proofs, the court found that plaintiffs did "not establish[ ] by a preponderance of the direct and circumstantial evidence that there is a nexus between any discharge by defendant Sue's Clothes Hanger and the groundwater contamination at issue." The court reasoned that, even though the Spill Act establishes strict liability for the consequences of a hazardous substance discharge, *N.J.S.A.* 58:10–23.11a, there is nevertheless a requirement of a "nexus between the discharge and the need for remediation and consequent damage." In concluding that no such nexus was demonstrated in this case, the judge made the following findings of fact:

1. The groundwater contamination at issue preceded this defendant's dry cleaning operation;

---

[3] Also named as third-party defendants were the Scharlats (Louis Scharlat and Conchetta Scharlat), Anthony Chirico, Donald H. Hickman, Floyd S. Randolph and Cleaning Village of Somerset, Inc., none of whom appeared for trial.

2. Similarly, the contaminated soil found on the Lapinski property, of a low level, was contaminated prior to defendant's dry cleaning operation;

3. The PCE found in the pit behind the dry cleaning machines inside defendant's store was not a source of a groundwater contamination. The dye test established that this material went into the sanitary sewer system and not into the groundwater. The dye test also established that dye did not appear in any of the affected wells.

4. The drip from the outside pipe at defendant's store was not re-tested. There is no evidence that the drip was continuous or intermittent. As distinguished from the Zaccardi building, there is no evidence that the pavement at defendant's establishment onto which the drip flowed showed any signs of PCE contamination through cracking or erosion of the asphalt;

5. The fact that the DEP or [MBRHC] took no other action regarding the outside drip after [their investigators] took [the] initial sample is circumstantial evidence that the DEP did not consider the drip to be of significance regarding its investigation of the source of the groundwater contamination;

6. There were dry cleaning operations at the Lapinski building since the 1950s unrelated to the defendant's operation. There is no evidence that the PCE in the groundwater or soil at the Lapinski premises came, even in part, from this defendant's operation rather than from the other person's [sic] or entities who operated dry cleaning establishments on the Lapinski property over a four decade period. In this regard, the court restates its findings, based on Vogel's testimony, that the well-contamination preceded defendant's dry-cleaning operation;

7. Plaintiff's primary witness, Ms. Vogel, was unable to establish or identify the source of the PCE that contaminated the groundwater in light of the history of dry cleaning operations at the Lapinski building. Because there are other alternative sources of PCE contamination from the Lapinski building, as well as from Zaccardi's, the plaintiff has not established by a preponderance of the evidence that this defendant contributed to contamination of the groundwater.

Accordingly, the court entered an order dismissing with prejudice plaintiffs' complaint, as well as the third-party complaint.

On appeal, plaintiffs contend that the judge misapplied the Spill Act by not finding defendant strictly liable for the PCE discharge from an outside pipe in 1988, even if considered only a de minimus discharge. We disagree.

I.

As a threshold matter, we note that findings by a trial judge sitting without a jury "are considered binding on appeal when supported by adequate, substantial and credible evidence."

*Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). An appellate court does " 'not disturb the factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.' " *Ibid.* (quoting *Fagliarone v. Twp. of N. Bergen*, 78 *N.J.Super.* 154, 155, 188 *A.*2d 43 (App.Div), *certif. denied*, 40 *N.J.* 221, 191 *A.*2d 61 (1963)). Furthermore, "an appellate court may not 'engage in an independent assessment of the evidence as if it were the court of first instance.' " *In re Taylor*, 158 *N.J.* 644, 656, 731 *A.*2d 35 (1999) (quoting *State v. Locurto*, 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999)). So long as " 'there is sufficient credible evidence in the record to support the findings[,]' " the court will defer to the judge. *Brunson v. Affinity Fed. Credit Union*, 199 *N.J.* 381, 397, 972 *A.*2d 1112 (2009) (quoting *State v. Adams*, 194 *N.J.* 186, 203, 943 *A.*2d 851 (2008)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

 On this score, *N.J.S.A.* 58:10–23.11g(c)(1) provides in pertinent part that

> any person *who has discharged a hazardous substance, or is in any way responsible for any hazardous substance*, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such *person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department* or a local unit[.]

[ (emphasis added).]

The Spill Act establishes strict liability for the consequences of the discharge of a hazardous substance. Spill Act liability must be proven by a preponderance of the evidence. *Lacey Mun. Utils. Auth. v. N.J. Dep't of Envtl. Prot., Envtl. Claims Admin., Spill*

*Comp. Fund*, 369 *N.J.Super.* 261, 273, 848 *A.*2d 843 (App.Div. 2004).

A "[d]ischarge" is

any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State *when damage may result* to the lands, waters or natural resources within the jurisdiction of the State[.]

[*N.J.S.A.* 58:10–23.11b (emphasis added).]

"Hazardous substances" are defined by the state and federal environmental agencies, *N.J.S.A.* 58:10–23.11b, and DEP has defined PCE, TCE, and DCE as hazardous substances. *N.J.A.C.* 7:1E, Appx. A.

Plaintiffs contend that because defendant allowed PCE to be discharged from an outside pipe onto the ground, defendant and its predecessor operators at the site are strictly liable under *N.J.S.A.* 58:10–23.11g(c)(1) for all costs and damages associated with all of the PCE contamination in the area. That is, the Spill Act must be interpreted and applied very broadly to find that any discharge at any time, even a de minimis one, imposes liability on all operators handling that product, and that a direct causal connection between the discharge and the damages need not be established.

In support of this argument, plaintiffs cite to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 *U.S.C.A.* §§ 9601–9675, the federal analogue to the Spill Act, which they claim requires no direct causal connection between a defendant's release or threatened release of hazardous substances and the plaintiff's incurrence of response costs. *United States v. Alcan Aluminum Corp.*, 964 *F.*2d 252, 264 (3d Cir.1992). Plaintiffs also rely on *New Jersey Turnpike Authority v. PPG Industries, Inc.*, 197 *F.*3d 96 (3d Cir.1999), for the proposition that they need to show only the slightest connection between defendant and the contaminant itself.

Plaintiffs' reliance on CERCLA is misplaced. In *Alcan, supra,* the Third Circuit articulated a less stringent standard to prove a

"release" of a hazardous contaminant for reimbursement under CERCLA, but it did not abandon the requirement that there must be proof of a party's "hazardous substance[ ] at a facility 'from which there is a release or threatened release *which causes the incurrence of response costs.*'" 964 *F*.2d at 264–65 (quoting 42 *U.S.C.* § 9607) (emphasis added).

*New Jersey Turnpike Authority, supra,* is similarly unavailing. There, the agency sought to hold three companies, who used chromium ore, liable under CERCLA and the Spill Act for seven sites along the Turnpike that were contaminated with chromium ore. 197 *F*.3d at 99–100. The only contest was whether reliable evidence tied the defendants to the contaminated sites. The District Court granted the companies' motion for summary judgment. *Id.* at 99. In affirming, the Third Circuit stated:

> In this appeal, the Turnpike also argues that the Spill Act should receive an expansive construction, for its strict liability scheme includes any person who is "in any way responsible for any hazardous substance," and the Spill Act is supposed to be construed liberally to effectuate its purposes. The Supreme Court of New Jersey has determined that a party "even remotely responsible for causing contamination will be deemed a responsible party under the Act." However remote a party's responsibility under the Spill Act may be, the statute nevertheless requires some degree of particularity; one cannot be "responsible" for a hazardous substance without having some connection to the site on which that substance was deposited. In other words, ... the Spill Act places a burden on the Turnpike to demonstrate some connection or nexus between the COPR [chromate ore processing residue] at the sites in question and the appellees in this case.
>
> [*Id.* at 105–06 (footnotes and internal citations omitted).]

■ To be sure, the Spill Act cases determining issues of liability have generally focused on the necessary connection between the offending discharge and the discharger and/or owner of the property, broadly construing the statutory standard of "in any way responsible" as encompassing either ownership or control over the property at the time of the damaging discharge, or control over the hazardous substance that caused the contamination. *State, Dep't of Envtl. Prot. v. Ventron Corp.,* 94 *N.J.* 473, 502, 468 *A*.2d 150 (1983). *See also Marsh v. N.J. Dep't of Envtl. Prot.,* 152 *N.J.* 137, 146–47, 703 *A*.2d 927 (1997); *In re Kimber Petroleum Corp.,* 110 *N.J.* 69, 85, 539 *A*.2d 1181, *appeal dismissed,*

488 *U.S.* 935, 109 *S.Ct.* 358, 102 *L.Ed.*2d 349 (1988). Although none of the Spill Act cases expressly state the necessity for further proving a "nexus" between a discharge and damages resulting from the contaminated discharge, such a requirement is implicit in these holdings. It is also evident from the Spill Act's very definition of a "discharge," which explicitly refers to resultant "damage[s]." *N.J.S.A.* 58:10–23.11b.

As is plain from that definition, some nexus between the use or discharge of a substance and its contamination of the surrounding area is needed to support a finding of Spill Act liability. *N.J. Tpk. Auth., supra,* 197 *F.*3d at 106. Discharge liability under the Spill Act does not result from passive migration of hazardous materials already present in the soil or in the groundwaters. *State, Dep't of Envtl. Prot. v. J.T. Baker Co.,* 234 *N.J.Super.* 234, 245, 560 *A.*2d 739 (Ch.Div.1989), *aff'd,* 246 *N.J.Super.* 224, 587 *A.*2d 279 (App.Div.1991). Nor is the placement of hazardous waste stored in containers a "discharge" because there was and has been no interaction with the environment. *White Oak Funding, Inc. v. Winning,* 341 *N.J.Super.* 294, 300, 775 *A.*2d 222 (App.Div.), *certif. denied,* 170 *N.J.* 209, 785 *A.*2d 437 (2001). In *Atlantic City Municipal Utilities Authority v. Hunt,* 210 *N.J.Super.* 76, 509 *A.*2d 225 (App.Div.1986), we concluded that "a discharge is some action resulting in an environmental effect *caused* by an interaction with the environment." *Id.* at 100, 509 *A.*2d 225 (emphasis added).

Plaintiffs cite to no case where a discharge without some proof of resultant damage renders the discharger liable under the Spill Act. Furthermore, "[c]leanup and removal costs" are defined as "all direct costs *associated with* a discharge, and those indirect costs that may be imposed by the department . . . *associated with* a discharge, incurred by the State or its political subdivisions." *N.J.S.A.* 58:10–23.11b (emphasis added). The Legislature declared its purpose was

to provide liability *for damage sustained* within this State *as a result* of any discharge of said substances, . . . and to provide a fund for swift and adequate

compensation to resort businesses and other persons *damaged by such discharges,* and to provide for the defense and indemnification of certain persons under contract with the State for claims or actions resulting from the provision of services or work to mitigate or clean up a release or discharge of hazardous substances. [*N.J.S.A.* 58:10-23.11a (emphasis added).]

Thus, it was plaintiffs' burden to demonstrate that defendant had some connection to the damages caused by the PCE contamination, or had added to any contamination already caused by past operation.

Plaintiffs make much of the fact that PCE was found in the soil and groundwater samples taken at defendant's store in 2000, twelve years after the first sampling in 1988. They then speculate that the 1988 discharge from the outside pipe could have flowed across the driveway onto the soil or leaked into the groundwater through unseen cracks in the asphalt, or that the inside discharge could have found its way into the groundwater through cracks in the sewer pipes. These intimations, however, were not established by the evidence. There was no proof, for example, that defendant's asphalt driveway was cracked or eroded, or that the contaminated discharge did not evaporate soon after hitting the asphalt and before getting into the soil or groundwater. Moreover, DEP representatives never retested the outside "drip" and there was no indication that the pipe continued to drip or, if it did, where the drip went after striking the pavement. And while there was testimony that sewer pipes are not usually a source of groundwater contamination unless there is a "major crack in the lines," the record is barren of proof that the integrity of the sewer line had been compromised in any way. As properly found by the trial judge, the circumstances are devoid of the critical factor that triggers Spill Act liability, namely that defendant must be in any way responsible for the discharge that *caused* the contamination.

The question remains, however, whether defendant, a tenant corporation, can avoid liability under the Spill Act simply because the Sammans were not its corporate owners/operators at the time one of its unknown predecessors might have contaminated the

groundwater with its discharge. In this regard, there was evidence that a dry cleaning business had been on the property since the 1950s, and that the Sammans had bought the business from the Shahs and continued using the same employees and equipment for about fifteen months thereafter. There was also no evidence that they had done any due diligence with respect to the hazardous materials used by the operation. In *Department of Transportation v. PSC Resources, Inc.,* 175 *N.J.Super.* 447, 467, 419 *A.*2d 1151 (Law Div.1980), the court determined that

> where "the successor corporation acquires all or substantially all the assets of the predecessor corporation for cash and continues essentially the same operation as the predecessor corporation . . . ," *Ramirez v. Amsted Industries, Inc.,* 171 *N.J.Super.*[261,] 278 [408 *A.*2d 818] [ (App.Div.1979), *aff'd,* 86 *N.J.* 332 [431 *A.*2d 811] (1981) ], the successor incurs liability for the damages resulting from any discharges of hazardous substances by its predecessor.

Fundamentally, a corporation is "an entity wholly separate and distinct from the individuals who compose and control it." *Yacker v. Weiner,* 109 *N.J.Super.* 351, 356, 263 *A.*2d 188 (Ch.Div.1970), *aff'd o.b.,* 114 *N.J.Super.* 526, 277 *A.*2d 417 (App.Div.1971). However, plaintiffs did not prove that a corporation owned the business at the time of the allegedly damaging discharge, the identity of any such corporation, or even, more importantly, whether one of defendant's predecessors, or one of the previous dry cleaning establishments in the other two units of the strip mall or nearby, was the contaminating discharger. Consequently, we see no reason to disturb either the factual findings of the trial judge or his legal conclusion of no Spill Act liability.

II.

Lastly, plaintiffs argue that the judge erred by denying them leave to amend their complaint and add the third-party defendants, the Shahs and their corporate entities, PTR, PTB and PTM Corp., as direct defendants. We disagree.

In denying relief, the court reasoned that plaintiffs' long delay in filing their motion—sixty months after plaintiffs' complaint and thirty-six months after defendant's third-party complaint—would greatly prejudice the Shahs. The court pointed to the lack of

adversity between defendant and the Shahs, and to the fact that the Shahs relied "on the absence of the strength [of the evidence] developed by [defendant]." Therefore, to allow a more "aggressive" direct claim by plaintiffs would have "compelled" the court "to recess this trial for at least six months so [the Shahs] could reorganize and regroup."

Third-party practice is governed by *Rule* 4:8–1. Under that rule, a defendant, within ninety days from service of the original answer, can file a third-party complaint upon a third-party defendant. After the third party is joined, *Rule* 4:8–1(b) declares that

[t]he plaintiff, within 45 days after being served with the third-party complaint, . . . may amend the complaint to assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of plaintiff's claim against the third-party plaintiff; there-after plaintiff may so amend the complaint *only by leave of court* on notice to the parties to the action. . . . [D]iscovery shall proceed as provided by *R.* 4:24–1.

[ (emphasis added).]

The motion may be denied if granting it would unduly complicate or delay the trial or otherwise prejudice the parties, particularly if the defendant's cause of action will survive to support a separate action. *Du–Wel Prods., Inc. v. U.S. Fire Ins. Co.*, 236 *N.J.Super.* 349, 364, 565 *A.*2d 1113 (App.Div.1989), *certif. denied*, 121 *N.J.* 617, 583 *A.*2d 316 (1990). The standard of review under both *Rules* 4:8–1 and 4:9–1 is an abuse of discretion. *Franklin Med. Assocs. v. Newark Pub. Sch.*, 362 *N.J.Super.* 494, 506, 828 *A.*2d 966 (App.Div.2003); *Wm. Blanchard Co. v. Beach Concrete Co., Inc.*, 150 *N.J.Super.* 277, 299–300, 375 *A.*2d 675 (App.Div.), *certif. denied*, 75 *N.J.* 528, 384 *A.*2d 507 (1977).

In our view, the judge did not abuse his discretion, especially since the motion was made during the last witness's testimony, so close to the end of the trial, and plaintiffs knew of the Shahs's existence long before the trial had started. Moreover, allowing a direct claim so late in the proceedings would have prejudiced the Shahs. Indeed, as the Shahs claim, had they been aware of plaintiffs' intentions, they more than likely would have approached discovery and the litigation differently. Thus, we discern no

abuse of judicial discretion in refusing to allow plaintiffs to amend their complaint to add the Shahs as direct defendants.

Affirmed.