Justice LaVECCHIA,
concurring in part and dissenting in part.
The common law on tort liability is not static. Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 435, 625 A.2d 1110 (1993). With changes in social expectations, values, and public policy, the common law evolves to keep pace with what we expect of one another. Ibid. This is not new, but rather a benefit of the common law long recognized by this Court. We have said there is a “ ‘power of growth ... inherent in the common law[1] ” and accordingly it “cannot be immutable or inflexible.” Ibid, (quoting State v. Culver, 23 N.J. 495, 506, 129 A.2d 715, cert. denied, 354 U.S. 925, 77 S.Ct. 1387, 1 L.Ed.2d 1441 (1957)).
In this matter, the majority has adopted an inflexible posture toward the development of nuisance law. Plaintiffs John and Pamela Ross claim that they experienced an extended period of disruption in the use and enjoyment of their property as a result of an oil leak that migrated from an underground storage tank located on a neighboring property. Although the insurers of that neighboring property took responsibility for performing the indi *516 vidual defendants’ cleanup process, plaintiffs claim that the process took an unreasonable amount of time and seek to hold the individual defendants liable for the untimely failure to abate. For the reasons that follow, I would have permitted plaintiffs to pursue their failure-to-timely-abate nuisance claim that is built on a theory of an unreasonable delay in action by the landowner’s agents. I therefore dissent from that portion of the majority’s judgment.
I.
As thus far developed, the facts related to the length of time taken during the cleanup of plaintiffs’ property deserve highlighting.
An oil leak originated from the underground storage tank (UST) located at 72 Leighton Avenue in Red Bank, New Jersey. At the time the leak was discovered, that property was owned by defendant Karen Lowitz, who had purchased the property in 1999 from defendant Susan Ellman. While the property was possessed by Ellman, it was insured by defendant High Point Preferred Insurance Company (High Point). Upon Lowitz’s purchase, the property became insured through defendant State Farm Fire and Casualty Company (State Farm). In March 2003, Lowitz switched insurers to defendant New Jersey Manufacturers Insurance Company (NJM).
The oil leak was discovered in 2003, after Lowitz had entered into an agreement to sell the property to Calvin Haley.[1] Prior to closing, Advanced Tank Services, Inc., tested the UST on the property and found oil leakage. Upon being notified of the leak, defendant insurance carriers, State Farm and NJM, undertook *517 financial responsibility for remediation of 72 Leighton Avenue and affected properties.
Plaintiff John Ross purchased the single-family home located at 66 Leighton Avenue on July 1, 2004. When John purchased the property in 2004, he was unaware of any contamination on his property. In May 2007, a week after signing a contract for the sale of his home for $325,000, John learned that oil from the aforesaid oil leak had migrated onto his property. As a result, the prospective buyers cancelled their contract to purchase the 66 Leighton Avenue property.[2] John married plaintiff Pamela Ross in 2007, and the couple continued to reside at 66 Leighton Avenue.
In July 2007, an environmental consultant hired by High Point requested access to plaintiffs’ property to take soil and groundwater samples.
In August 2007, plaintiffs’ attorney sent a letter to the representative of NJM and State Farm detailing disruptions to plaintiffs’ use of the property as a result of the oil leak from 72 Leighton Avenue.
In October 2007, State Farm and NJM tentatively agreed to pay $20,000 to compensate plaintiffs for removal or destruction of a retaining wall, deck, and above-ground pool that was anticipated to occur during the remediation process.
Plaintiffs’ attorney then sent multiple letters to the representative of State Farm and NJM explaining the harm suffered by plaintiffs as a result of the leak, many of which did not receive a response.
Ultimately, on August 17, 2009, after the filing of the present action, a consent order was entered in which State Farm and NJM agreed to provide plaintiffs with all documentation regarding the contamination and cleanup, to pay plaintiffs $2,075 per month for their carrying costs for 66 Leighton during times that the cleanup *518 involved excavation or use of heavy equipment on their property, and to restore the property to its former condition with the exception of paying plaintiffs $21,500 in lieu of restoring plaintiffs’ pool, deck, retaining wall, and electric improvements.
A remediation excavation occurred between September 3, 2009, and October 28, 2009 — a period of time lasting approximately sixty days and occurring after more than two years had elapsed from the date that soil samples had been taken by defendants’ agents. In August 2010, the New Jersey Department of Environmental Protection issued a “No Further Action Letter” to plaintiffs, informing them that remediation of the oil contamination on their property was complete. Thereafter, a “No Further Action Letter” encompassing all of the contamination from the oil tank was issued for all affected properties in October 2011.
II.
“Determining the scope of tort liability has traditionally been the responsibility of the courts.” Hopkins, supra, 132 N.J. at 439, 625 A.2d 1110 (citing Kelly v. Gwinnell, 96 N.J. 538, 552, 476 A.2d 1219 (1984)). In determining whether to recognize a duty of care, we look at
whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors — the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rales to govern future conduct.
[Ibid, (emphasis added) (citations omitted).]
Applying those principles in Hopkins, supra, this Court imposed upon “a real estate broker ... [the] duty to ensure through reasonable inspection and warning the safety of prospective buyers and visitors who tour an open house.” Id. at 448, 625 A.2d 1110. In doing so, the Court declined to fit the situation into a “common law classification” but, instead, focused on the following inquiry: “whether in light of the actual relationship between the *519 parties under all of the surrounding circumstances the imposition on the broker of a general duty to exercise reasonable care in preventing foreseeable harm to its open-house customers is fair and just.” Id. at 438, 625 A.2d 1110. The Court then answered that question in the affirmative, highlighting the relationship between the broker, homeowner, and invitees; the foreseeability of injury to guests in an unfamiliar home; and the public interest furthered by the result. Id. at 439-48, 625 A.2d 1110.
This Court has permitted a plaintiff to develop previously unrecognized causes of action consistent with evolving notions of fairness and justice when the exercise of reasonable care would prevent foreseeable harm. Thus, the common law of tort has evolved to address circumstances that may not have been advanced in the past but were deserving of expansion. See, e.g., Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 895 A.2d 1143 (2006).
Relying on the principles set forth in Hopkins, the Olivo Court found that a defendant-employer, who “owed a duty to workers on its premises for the foreseeable risk of exposure to friable asbestos and asbestos dust,” also “owed a duty to spouses handling the workers’ unprotected work clothing based on the foreseeable risk of exposure from asbestos borne home on contaminated clothing.” Id. at 401-02, 404-05, 895 A.2d 1143. The Court noted that the question of whether to impose such a duty was “a question of foreseeability of the risk of harm to that individual or identifiable class of individuals.” Id. at 403, 895 A.2d 1143. After “weighing and balancing the relationship of the parties, the nature of the risk and how relatively easy it would have been to provide warnings to workers,” the Court concluded that imposition of that duty was foreseeable and consistent with public policy and the prevention of harm. Id. at 405, 895 A.2d 1143.
Those cases exemplify a fundamental principle of our common law, which is “that it can, and must, change when change is appropriate.” State v. Int’l Fed’n of Prof l & Tech. Eng’rs, Local 195, 169 N.J. 505, 534, 780 A.2d 525 (2001). The question here is *520 whether there is a need for development or change in the recognized tort of nuisance in this state.
III.
Generally, nuisance law in New Jersey has been “guided by the principles set forth in the Restatement (Second) of Torts [ {Restatement ) ].” Smith v. Jersey Cent. Power & Light Co., 421 N.J.Super. 374, 389, 24 A.3d 300 (App.Div.), certif. denied, 209 N.J. 96, 35 A.3d 679 (2011); see also Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes, 90 N.J. 582, 592, 449 A.2d 472 (1982). But we are not bound to follow the Restatement as if it provides a statutory prescription. See, e.g., P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 174-75, 962 A.2d 453 (2008) (noting Restatement’s role as guide for relevant policies or interests that “might bear on the [choice of law] analysis”); Perez v. Wyeth Labs., Inc., 161 N.J. 1, 14-15, 734 A.2d 1245 (1999) (noting that Restatement serves complementary role in state’s own development of common law). It is a guide for our consideration of principles of or about social responsibility that we in New Jersey choose to respect.
Section 822 of the Restatement outlines the “General Rule” for liability for a private nuisance:
One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another’s interest in the private use and enjoyment of land, and the invasion is either
(a) intentional and unreasonable, or
(b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.
[Restatement (Second) of Torts § 822 (1979).]
The Restatement also advises that an actor may be liable for a private nuisance if he or she engages in the following conduct: (1) “an act; or” (2) “a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate ... the invasion of the private interest.” Id. § 824 (emphasis added).
*521 In conjunction, the sections support that defendants can be held liable for intentionally and unreasonably, or negligently or recklessly,[3] “failing] to act under circumstances in which [they were] under a duty to take positive action to prevent or abate ... the invasion of [another’s] private interest” in the use and enjoyment of his or her land, see ibid., if their conduct was the “legal cause” of that invasion, see id. § 822.
Comment (e) to section 824 of the Restatement discusses the actions that constitute a “failure to act” within the meaning of that section, stating,
[o]ne is ordinarily subject to no liability to another merely because he has failed to take positive action to prevent another from being harmed. There are, however, certain circumstances under which the law imposes a duty on a person to take positive action for the protection of another and subjects him to liability if he fails to meet the standard of action required in the particular case. (See §§ 838-840).
[/A § 824 comment e (citation omitted).]
Among the sections referenced, only Restatement section 839 is relevant to this matter. That section states:
A possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and
(a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and
(b) he knows or should know that it exists without the consent of those affected by it, and
(c) he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it.
[/A § 839.]
Although, as the majority highlights, ante at 509, 120 A.3d at 187, comment (g) to section 839 states that, “[t]he phrase ‘if the nuisance is otherwise actionable’ means that all other elements necessary to liability under the rule stated in § 822 ... must be present in addition to the breach of duty specified in this Section,” *522 Restatement (Second) of Torts § 839 comment g (1979), additional comments and illustrations to section 839 create ambiguity as to what that phrasing requires.
The comments to section 839 of the Restatement acknowledge that liability under that section
is not based upon responsibility for the creation of the harmful condition, but upon the fact that [the landownei’] has exclusive control over the land and the things done upon it and should have the responsibility of taking reasonable measures to remedy conditions on it that are a source of harm to others.
[Id. § 839 comment d.]
The comments further acknowledge that section 839 does not create “an absolute duty to prevent harm to others at all costs, but merely a duty to do what is practicable and reasonable under the circumstances.” Id. § 839 comment e. In my view, that reference to a duty based on what is “practicable and reasonable” should guide our approach to this failure-to-timely-abate nuisance claim brought by plaintiffs. The illustrations provide pointedly helpful insight into the application of section 839 of the Restatement to the instant matter:
1. A is in possession of land upon which is situated a tank for the storage of petroleum. B is in possession of land 500 yards from this tank. Without A’s knowledge or negligence the tank develops an underground leak and a quantity of oil flows out, saturates A’s land and drains into an unknown subterranean stream that carnes it to B’s land. As a result, B’s well that supplies his drinking water is polluted and rendered unfit for use. When A learns of this he immediately removes all the remaining oil from the tank but the oil already in his land continues to pollute B’s well for some time. It is found that A’s maintenance of the oil tank was not abnormally dangerous. A is not liable to B for failing to take action to remove the oil already in his land, since it would not be practicable to do so.
2. The same facts as in Illustration 1 except that when he learns of the leak, A fails to remove the oil remaining in the tank and this oil subsequently leaks out and pollutes B’s well for a considerably longer time than it would otherwise have been polluted. A is subject to liability to B for the additional pollution.
[Id. § 839 comment f, illustrations 1, 2 (emphasis added).]
This case comes close to factually mimicking illustration 1, but the present reality is that one can, and now does, remove contaminated dirt in spill cleanups as a normal practice. See, e.g., Marsh v. N.J. Dep’t of Envtl. Prot., 152 N.J. 137, 140, 703 A.2d 927 (1997) (noting landowner’s $41,000 expense for removing under *523 ground gasoline tanks and accompanying contaminated soil); Lacey Mun. Utils. Auth. v. N.J. Dep’t of Envtl. Prot., 369 N.J.Super. 261, 269, 848 A.2d 843 (App.Div.2004) (noting removal of 4,000 tons of gasoline-contaminated soil); see also Sensient Colors, Inc. v. Allstate Ins. Co., 193 N.J. 373, 379-80, 939 A.2d 767 (2008) (discussing removal of lead-contaminated soil in residential lots neighboring plaintiffs factory); Twp. of Montclair v. Hughey, 222 N.J.Super. 441, 443-44, 537 A.2d 692 (App.Div.1987) (noting removal of “15,000 barrels of contaminated soil” in residential lots). What once may not have been practicable is now practicable and a typical remediation practice for oil spills and other environmental contamination of soil. The illustration is outdated; it has not kept pace with current typical remediation practices. Thus the foreseeable harm to a neighboring landowner from a leaking oil tank spreading its contamination onto another’s property has a practicable remedy, and fairness dictates that the duty to abate this intrusion should be addressed in a reasonably timely manner. See Hopkins, supra, 132 N.J. at 439, 625 A.2d 1110.
I would recognize the modern times in which we live and hold that one can be liable under a failure-to-timely-abate theory. As the majority concedes, the New Jersey Spill Compensation and Control Act is no impediment to this development of our common law, ante at 505 n. 6, 120 A.3d at 184-85 n. 6 (citing N.J.S.A. 58:10-23.11v). Therefore, I would allow this claim to proceed.
Although I dissent in part from the judgment of the Court in this matter as noted, I concur in the majority’s conclusion that plaintiffs are not third-party beneficiaries of the applicable insurance contracts and have no direct cause of action against the insurance carrier defendants.

 Although there is a factual question based on contradictory opinions as to when the leak started, there is evidence that the leak originated at 72 Leighton as early as January 1993-”[t]he 95% confidence range for the mean from the supporting calculation is April 1990 to September 1995,” according to an expert report filed in this matter.

 Plaintiffs eventually sold the property for $190,000 in a short sale in 2011 after cleanup was complete.

 Defendants could be held liable if they invaded plaintiffs' private interests in violation of the principles governing "abnormally dangerous conditions or activities;" however, storage of a UST does not meet the definition of an abnormally dangerous activity under the Restatement, see id, § 520, and plaintiffs do not press that point on appeal.